# RENEGOTIATION BOARD *v.* GRUMMAN AIR-CRAFT ENGINEERING CORP.

No. 73–1316.   Argued January 14, 1975—Decided April 28, 1975

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, BLACKMUN, and REHNQUIST, JJ., joined. DOUGLAS, J., dissented. POWELL, J., took no part in the consideration or decision of the case.

*Allan Abbot Tuttle* argued the cause for petitioner. With him on the brief were *Solicitor General Bork, Assistant Attorney General Hills, Leonard Schaitman,* and *David M. Cohen.*

*Tom M. Schaumberg* argued the cause for respondent. With him on the brief was *Frederick B. Abramson.**

MR. JUSTICE WHITE delivered the opinion of the Court.

The issue in this case is whether certain documents—documents generated by the Renegotiation Board (Board) and by its Regional Boards in performing their task of deciding whether certain Government contractors have earned, and must refund, "excessive profits" on their Government contracts—are "final opinions" explaining the reasons for agency decisions already made, and thus expressly subject to disclosure pursuant to the Freedom of Information Act (Act), 5 U. S. C. § 552 (a)(2)(A), or are instead predecisional consultative memoranda exempted from disclosure by § 552 (b)(5). See *NLRB* v. *Sears, Roebuck & Co., ante,* p. 132.

## I

Essential to the consideration of whether the documents at issue in this case must be disclosed pursuant to the relevant provisions of the Act is an understanding of the renegotiation process, a process that itself serves to define the documents in issue and hereinafter described.[1]

---

*Melvin L. Wulf, Carol A. Cowgill,* and *Marvin M. Karpatkin* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

[1] See generally S. Rep. No. 93–927, pp. 1–2 (1974); Staff Review of Recommendations Made on the Renegotiation Process: A Preliminary Report 3–5 (1974) (prepared for the use of the House Committee on Ways and Means and the Senate Committee on Finance by the staff of the Joint Committee on Internal Revenue Taxation (hereinafter Staff Review)).

Under the Renegotiation Act of 1951, 65 Stat. 7, as amended, 50 U. S. C. App. § 1211 *et seq.*, the Government is entitled to recoup from those who hold contracts or subcontracts with certain departments of the Government any "excessive profits" received by such persons on such contracts. The amount of the profits which will be considered "excessive" in connection with a particular contract depends upon the statutory factors which are set forth in the margin.[2]   As the Board's name suggests, it

---

[2] Title 50 U. S. C. App. § 1213 (e) reads as follows:

"(e) The term 'excessive profits' means the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this title [§§ 1211 to 1224 of this Appendix] to be excessive. In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

"(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;

"(2) The net worth, with particular regard to the amount and source of public and private capital employed;

"(3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

"(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

"(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

"(6) Such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted."

These statutory "factors" were developed by the War Contracts Price Adjustment Board during World War II, were incorporated by Con-

endeavors to, and in fact does, conclude the vast majority of its cases by agreement. 50 U. S. C. App. § 1215 (a) (1970 ed., Supp. I). Absent an agreement, however, the Board must decide either to issue a "clearance," *i. e.,* a unilateral determination that the contractor realized no excessive profits during the year in issue, or to issue a unilateral order fixing excessive profits at a specified amount and directing the contractor to refund them. The unilateral order is final unless a *de novo* determination regarding excessive profits is sought within 90 days before the Court of Claims.[3] It is in those cases not terminated by agreement that the documents at issue in this case were generated.[4] With this in mind, we turn to the details of the renegotiation process as it existed during the period relevant to the decision in this case.[5]

Persons holding contracts or subcontracts with certain departments of the Government were required to file financial statements as prescribed by the Board, 50 U. S. C. App. § 1215 (e)(1) (1964 ed.); 32 CFR Part 1470, if their receipts from those contracts met the requisite jurisdictional amount, 50 U. S. C. App. § 1215 (f). These state-

---

gress into the original Renegotiation and Revenue Acts of that era, were continued in the Renegotiation Act of 1951, and have undergone little change since their initial development. Staff Review, *supra,* n. 1, at 23, and nn. 34–36.

[3] Prior to July 1971, *de novo* review was by the Tax Court. See 85 Stat. 98.

[4] Through June 30, 1970, 3,524 out of 4,006 cases not resulting in clearances terminated by agreement. Of the remaining 482 cases, the Board's unilateral orders were challenged in court in 203 cases.

[5] The description of the renegotiation process is of the process existing between 1962 through 1965—the period in which the documents relevant to this case were generated within the Board—notwithstanding changes made since. Unless otherwise indicated, all citations to the Code of Federal Regulations throughout this opinion are to the Renegotiation Board's regulations in effect during this period (*i. e.,* the Code as revised January 1, 1967).

ments were reviewed by the staff of the Board, and, if that initial review indicated the possibility that the contractor realized "excessive" profits, the "case" was referred to one of two Regional Boards for further action.[6] At the time of this assignment, each case was designated as a Class A case or a Class B case: the former if the contractor had reported profits of more than $800,000 on the relevant contracts covered in his financial statement, and the latter in all other cases.[7] The principal difference between Class A cases and Class B cases was that the Regional Boards had some final decisional authority in the latter and none in the former. 32 CFR §§ 1471.2 (b), 1473.2 (a), 1474.3 (a), and 1475.3 (a). Since the documents sought by respondent in this case were all generated in Class A cases, only the procedure applicable to those cases will be discussed.

After reference to a Regional Board, a case was usually assigned to a staff team consisting of an accountant and a renegotiator.[8] This team, after determining what further information from the contractor was required, secured such information and received any sub-

---

[6] The reference is normally made on the basis of geographical considerations, 32 CFR § 1471.2 (a). These Regional Boards were established in 1952 by regulation, 32 CFR § 1451.32, pursuant to statutory authorization, 50 U. S. C. App. § 1217 (d). Unlike members of the Board, who are appointed to the Board by the President, Regional Board members are civil servants.

[7] Under certain circumstances, cases may be redesignated after their initial designation. 32 CFR § 1471.2 (f).

[8] During the years 1962–1965, a renegotiator might be a staff member employed by the Regional Board or a member of the Regional Board itself. Under the Board's current regulations, a member of the Regional Board who acts as a renegotiator in a specific case is thereafter barred from participation in the case as a member of the Regional Board. 32 CFR § 1472.3 (d) (1974). There was no comparable regulation in effect during the period relevant to this case.

missions the contractor might have wanted to make with regard to his case, including his position concerning the statutory factors that largely determined whether he had received "excessive profits," 50 U. S. C. App. § 1213 (e). A document entitled "Report of Renegotiation" was then prepared by the team. Part IA of that report, the accountant's section, contained pertinent financial and accounting data and was furnished to the contractor upon request.[9] Part II of the Report of Renegotiation, prepared by the renegotiator, and not furnished to the contractor, generally contained "an analysis and evaluation of the case; and a recommendation with respect to the amount, if any, of excessive profits for the fiscal year under review." 32 CFR § 1472.3 (d). According to testimony given in this case, a Part II in outline form would be as follows:

"A. Sources of Information
"B. Application of Statutory Factors:
  "1. Character of Business
  "2. Capital Employed
  "3. Extent of Risk Assumed
  "4. Contribution to the Defense Effort
  "5. Efficiency
  "6. Reasonableness of Costs and Profiits
    "(a) Costs
    "(b) Pricing
    "(c) Profits
"C. Special Matters
"D. Conclusion and Recommendation."

After a Report of Renegotiation was prepared, but

---

[9] 32 CFR § 1472.3 (d). Under 1972 amendments to the regulations, the Report of Renegotiation was discontinued and was replaced by other reports not relevant to this case. See generally 32 CFR §§ 1472.3 (e)–(g), and (i) (1974).

prior to its submission to the Regional Board, the team assigned to the case endeavored to meet with the contractor to resolve "any issues or disputed matters of fact, law or accounting." 32 CFR § 1472.3 (b). The report was then submitted to the Regional Board.

After reviewing the Report of Renegotiation and the case file, the Regional Board would make a "tentative recommendation with respect to the amount of excessive profits realized in the fiscal year under review." 32 CFR § 1472.3 (e).[10] This "tentative recommendation" could "be in an amount greater than, equal to, or less than the amount recommended in the Report of Renegotiation." *Ibid.* After a "tentative recommendation" was made, the contractor, unless he declined, attended a meeting with the renegotiation team at which he was informed of the tentative recommendation of the Regional Board, as well as the Regional Board's reasons therefor, and was afforded the opportunity to respond. The Regional Board would then enter a "final recommendation" either that a clearance be issued or that excessive profits be found in an amount greater than, equal to, or less than the tentative recommendation reached previously. If this final recommendation of the Regional Board corresponded to that of the staff team or panel, the report would be signed by the chairman of the Regional Board, signifying the approval of the staff or panel recommendation; if the Regional Board's final recommendation differed from the prior recommendation, an addendum would be attached to the report. The Report of Renegotiation with addenda, if any, will hereafter be referred to for convenience as the Regional Board Report.

---

[10] Under current regulations, the Regional Board no longer makes this "tentative recommendation" in Class A cases, 32 CFR §§ 1472.3 (k) and (*l*) (1974).

## (i)

Assuming the Regional Board did *not* recommend a clearance, it notified the contractor of its final recommendation in an effort to obtain an agreement. Toward this end, the contractor, upon request, would be furnished a "summary of the facts and reasons" (Summary) upon which the recommendation was based. 32 CFR § 1472.3 (i).[11] If a contractor did not request such a document, there is no indication that one was ever prepared in his case.

If the contractor declined to enter into an agreement, the case was then reassigned to the Board, to which the case file including the Regional Board Report was transmitted. The case was then assigned to a "division" of the Board, usually consisting of three of its five members, which would undertake a study of the case. Staff personnel would go over both Part IA and Part II of the Regional Board Report and indicate, in memoranda, their

---

[11] This document was made available to the general public by regulation on February 24, 1971. 32 Fed Reg. 3808, 32 CFR § 1480.5 (a) (1972). When the Board first made the summaries of facts and reasons available to the public by regulation, it specifically stated that its action was taken "[w]ithout regard to the provisions of 5 U.S.C. [§] 552 (a)(2) ...." *Ibid.* Subsequent to the effective date of that regulation, the District Court in this case, notwithstanding the fact that the controversy over respondent's access to the summaries of facts and reasons sought in this action had apparently been mooted, held that these documents must be made available under the Act as "final opinions" of either the Board or the Regional Board, except in certain circumstances. 325 F. Supp. 1146, 1151–1152 (DC 1971). The Board has since amended its regulations, indicating that its own interpretation of the Act as to these documents is now consistent with that of the District Court. 32 CFR § 1480.5 (a) (1974). Under current Board regulations, the contractor automatically receives a document entitled "Proposed Opinion," if he has not indicated a willingness to enter into an agreement with the Board. 32 CFR § 1477.3 (a) (1974).

agreement or disagreement with the recommendation made by the Regional Board. At an appropriate juncture, the contractor would be afforded an opportunity to meet with the division members to discuss his case and submit additional relevant material. The division, in due course, would reach its own decision as to what recommendation should be made to the Board, "not . . . bound or limited in any manner by any evaluation, recommendation or determination of the Regional Board." 32 CFR § 1472.4 (b). The division would then submit to the full Board a report of the case, prepared by one of the members (Division Report), and including a recommendation for final disposition along with additional or contrary views, if any, of the other division members. The Division Report is one of the categories of documents sought by respondent under the Act.

The Board would then meet, each member having had the opportunity to study the case file and the report submitted on behalf of the division, discuss the case, and vote on a final disposition. Neither the Board nor any of its members were bound by any prior recommendations. The Board was free, after discussion, to reject the proposed conclusion reached in the Division Report, or to accept it for reasons other than those set forth in the report. 32 CFR § 1472.4 (d). Assuming the Board did not decide that a clearance should issue, the contractor was then notified of the Board's conclusion and would be given, at his request, a Summary to enable him to decide whether to enter into an agreement with the Board. If an agreement was not reached, the Board would then enter a *unilateral* order within a specified time, 32 CFR Part 1475, and would issue, pursuant to statute, at the request of the contractor, a "statement of such determination, of the facts used as a basis therefor, and of its reasons for such determination." 50 U. S. C. App.

§ 1215 (a) (Statement).[12]  Absent a contractor's request for a Statement, there is no indication that one was ever prepared in his case.  For this type of case, the renegotiation process thus came to an end.[13]

### (ii)

If the Regional Board concluded that no excessive profits had been realized by a particular contractor and that a clearance should therefore issue—or if the contractor agreed with the Regional Board as to an amount of excessive profits before the case was reassigned to the Board—then a Division Report was never created in that case.  Instead, a "final recommendation" that a clearance be issued or that the agreement be consummated was sent to the Board, and the Board considered the case on the basis of the Regional Board Report, together with comments made by the Board's accounting and review divisions.  After meeting and discussing the case on the basis of these documents, the Board decided whether to approve the Regional Board's conclusion.  If it did, appropriate closing documents were prepared by the

---

[12] The "Summaries" and "Statements" were similar in both format and content.  App. 35–41; 32 CFR § 1477.4.  Under current Board regulations, the Regional Board now issues to the contractor a "Proposed Opinion," in lieu of the "summary of facts and reasons" discussed above, and furnishes to the contractor a "Regional Board Opinion" when the Regional Board's recommendation is forwarded to the Board.  32 CFR §§ 1477.3 (a) and (c) (1974).  The Board also issues a "Final Opinion" in place of the Statement at the same time as it enters a unilateral order.  32 CFR § 1477.3 (b) (1974).  All of these documents are available to the public.  32 CFR § 1480.5 (a) (1974).

[13] A dissatisfied contractor had the right at this point to bring an action in the Tax Court, which had jurisdiction to determine *de novo* whether excessive profits had been realized (see n. 3, *supra*); jurisdiction of these cases has subsequently been transferred to the Court of Claims.  See *Renegotiation Board* v. *Bannercraft Clothing Co.*, 415 U. S. 1, 15 and n. 14 (1974).

Regional Board. No explanation of the Board's reasons for agreeing with the Regional Board's recommendation was prepared or sent to the contractor; and it is not possible to know whether the Board agreed with the reasoning of the Regional Board Report or just its conclusion. If the conclusion of the Regional Board was *not* approved, the case was either returned to the Regional Board for further factfinding, or assigned to a division of the Board as though no recommendation agreeable to the contractor had ever been made. The Regional Board Reports in the category of cases in which clearances were recommended and approved by the Board—and therefore in which no Division Report was created—is the other type of document in issue in this case.

## II

Against the foregoing backdrop, respondent filed a complaint, pursuant to the Act, in the District Court on June 27, 1968, seeking disclosure of "certain final opinions, orders and identifiable records" related to or issued during renegotiation proceedings involving 14 other companies during the period 1962–1965.[14] Respondent additionally sought certain documents related to its then-pending renegotiation proceedings before the Board for 1965, but later agreed that it was not seeking access to "[i]ntra-agency memoranda and communications consisting of ad-

---

[14] By reference in its complaint to correspondence between it and the Board of April 26, 1968, respondent requested access to "final opinions, determinations, unilateral orders, agreements, clearance notices and letters not to proceed issued in the adjudication of renegotiation cases" and "written summaries of the facts and reasons upon which such final opinions, determinations, unilateral orders and agreements have been reached." Nothing in the complaint or the letter suggests that, at that time, respondent sought the Regional Board Report, or the Division Report, in any of these renegotiation cases.

visory opinions, conclusions, recommendations, and analyses prepared by personnel and members of the Board" in its own case. 138 U. S. App. D. C. 147, 150, 425 F. 2d 578, 581 (1970). The District Court denied relief. On appeal, the Court of Appeals appears to have assumed that the "opinions" sought by respondent were limited to Statements and Summaries as defined in 32 CFR § 1480.8.[15] 138 U. S. App. D. C., at 148, and n. 2, 425 F. 2d, at 579, and n. 2. On this basis, the Court of Appeals reversed, rejecting the claim of the Renegotiation Board that the documents sought were "completely immune" from disclosure under 5 U. S. C. § 552 (b)(4), the provision of the Act exempting certain privileged or confidential information submitted to the Government by any person.[16] The court, stating that the Board was required to make available " 'final opinions, including concurring and dissenting opinions,' "[17] remanded the case to the District Court for further proceedings in which the requested documents were to be made available after "suitable deletions." 138 U. S. App. D. C., at 150, 425 F. 2d, at 581.

[15] Title 32 CFR § 1480.8 read in pertinent part:

"Except as authorized . . . opinions and orders will not be published or made available to the public . . . inasmuch as they are regarded as confidential . . . by reason of the confidential data furnished by contractors. . . . For the purposes of this paragraph, the term 'opinion' includes a statement furnished pursuant to [32 CFR Part 1477] and the term 'order' includes an agreement to eliminate excessive profits, as well as a unilateral determination. Opinions and orders are not cited as precedents in any renegotiation proceedings."

Part 1477, as written during the period 1962–1967, included only Statements and Summaries.

[16] Title 5 U. S. C. § 552 (b)(4) exempts from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential matters."

[17] 138 U. S. App. D. C., at 149, 425 F. 2d, at 580, quoting from 5 U. S. C. § 552 (a)(2)(A).

Subsequent to the remand of the case by the Court of Appeals, the Board turned over to respondent certain documents, including Statements and Summaries, in attempted compliance with the mandate of that court. Respondent, not satisfied with the documents so disclosed, moved in the District Court for the disclosure, *inter alia,* of (1) Division Reports in all cases in which neither "Statements" nor "Summaries" were created; (2) Regional Board Reports resulting in a clearance; and (3) any document concurring in or dissenting from (1) and (2) above.[18]

On the question whether these documents were "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases," 5 U. S. C. § 552 (a)(2)(A), the District Court permitted respondent to take the deposition of the then Chairman of the Board. That deposition of the Chairman constitutes almost the only evidence of record in this case bearing on this question other than the pertinent statutes and regulations. Although conceding, as it had to on the basis of the Chairman's deposition, that only the Board had final decisional authority, and that it studies and considers, but does not adopt Regional Board or Division Reports, the District Court held that these reports were "final opinions" for purposes of the Act and rejected the Board's contention that the documents were specifically exempted from disclosure under subsection (b)(5) of the Act, 5 U. S. C. § 552 (b)(5) (Exemption 5), which encompasses:

> "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."

---

[18] A more detailed description of the documents sought is set out in the opinion written by the District Court after the initial remand from the Court of Appeals, 325 F. Supp., at 1151.

As to the Regional Board Reports in clearance cases, the court characterized the clearance as the "decision" of the Regional Board "unless the Board is not in accord"; and held that "[i]n order for the public to be fully informed, the reasons behind the clearance . . . must be made available and in this type of case such . . . reasons are found in the Regional Board's report." As to the Division Reports, the court said that, although the Board may disagree with the reasoning of the report, "[i]t is in fact the last document which explains reasons for the Board's decision," it should "at the very least . . . reflect the analysis of one member," and thus it must be disclosed at least as a "concurring [or] dissenting opinion." 5 U. S. C. § 552 (a)(2)(A). On appeal, the Court of Appeals affirmed the "findings of fact" and "conclusions" reached by the District Court and found two additional grounds supportive of the lower court's judgment as to the Regional Board Reports. The court held that, even if the Regional Board Reports recommending a clearance subsequently approved by the Board [19] were not "final opinions" of *the Board,* they were disclosable as final opinions of the Regional Board: the Regional Board itself was to be considered an "agency" for purposes of the Act, and the reports were certainly *its* "final opinions" and, as such, they were disclosable under the express provisions of 5 U. S. C. § 552 (a)(2)(A) and therefore outside the scope of Exemption 5. In concluding that the Regional Boards are agencies, the court relied in part on the power of the Regional Boards finally to dispose of certain Class B

---

[19] The District Court had held the reports of Regional Boards to be disclosable only in instances where a Regional Board made a final recommendation for a clearance and the Board concurred in the recommendation. *Id.,* at 1154. The Court of Appeals did not purport to extend the holding of the District Court to Regional Board Reports in other contexts.

cases.[20] In concluding that its decisions were "final," notwithstanding inevitable Board review, it analogized the power of the Regional Board in Class A cases to the power of a United States district court: the former's decisions being reviewable by the Board and the latter's by a United States court of appeals. The fact that the Regional Board's decisions were subject to review did not obviate the fact, any more than it does in the case of a United States district court, that its decisions are "final," 157 U. S. App. D. C. 121, 128, 482 F. 2d 710, 717 (1973), and that its report leading to a clearance was perforce a "final opinion" of an "agency" subject to disclosure under the Act. The Court of Appeals additionally held that the Regional Board Reports were, in any event, "identifiable records," 5 U. S. C. § 552 (a)(3), which are disclosable, unless exempt, and that these reports were not within the purview of Exemption 5 of the Act, because they "are not solely part of the consultative and deliberative process, but rather reflect actual decisions communicated outside the agency." 157 U. S. App. D. C., at 129, 482 F. 2d, at 718. See *NLRB* v. *Sears, Roebuck & Co., ante,* p. 132.

The Board brought the case to this Court and we granted certiorari, 417 U. S. 907 (1974), setting the case for argument with *NLRB* v. *Sears, Roebuck & Co., ante,* p. 132, in order to resolve the important questions presented particularly with respect to the proper construction and interpretation of Exemption 5 of the Act. For reasons set forth hereafter, we reverse the judgment of the Court of Appeals.

## III

Strictly speaking, the issue in this case is whether the Division Reports and the Regional Board Reports fall

---

[20] 157 U. S. App. D. C. 121, 126–127, and nn. 20 and 23, 482 F. 2d 710, 715–716, and nn. 20 and 23 (1973).

within Exemption 5, pertaining to "inter-agency or intra-agency memorandums . . . which would not be available by law to a party other than an agency in litigation with the agency."   5 U. S. C. § 552 (b)(5).[21]   As we hold today in the companion case of *NLRB* v. *Sears, Roebuck & Co., ante,* at 149, Exemption 5 incorporates the privileges which the Government enjoys under the relevant statutory and case law in the pretrial discovery context; and both Exemption 5 and the case law which it incorporates distinguish between predecisional memoranda prepared in order to assist an agency decisionmaker in arriving at his decision, which are exempt from disclosure, and postdecisional memoranda setting forth the reasons for an agency decision already made, which are not.   Because only the full Board has the power by law to make the decision whether excessive profits exist; because both types of reports involved in this case are prepared prior to that decision and are used by the Board in its deliberations; and because the evidence utterly fails to support the conclusion that the reasoning in the reports is adopted by the Board as *its* reasoning, even when it agrees with the conclusion of a report, we con-

---

[21] Grumman claims that the documents are "final opinions" expressly made disclosable, pursuant to 5 U. S. C. § 552 (a)(2)(A). However, as we noted in the companion case of *NLRB* v. *Sears, Roebuck & Co., ante,* at 147–148, a conclusion that the documents are within Exemption 5 would be dispositive in the Government's favor, since the Act "does not apply" to such documents; and a contrary conclusion would be dispositive against the Government, since it concedes that the documents are "identifiable records" otherwise disclosable pursuant to 5 U. S. C. § 552 (a)(3). Thus, strictly speaking, the question whether the documents are "final opinions" is relevant only in deciding whether Exemption 5 applies to them and is important only because we have construed Exemption 5 in *NLRB* v. *Sears, Roebuck & Co., ante,* at 153–154, not to include "final opinions" within the meaning of 5 U. S. C. § 552 (a)(2)(A).

clude that the reports are not final opinions and do fall within Exemption 5.

## A. *Regional Board Reports*

It is undisputed that the Regional Boards had no legal authority to decide whether a contractor had received "excessive profits" in Class A cases.[22]  In such cases, the Regional Boards could investigate and recommend, but only the Board could decide.   32 CFR §§ 1472.3–1472.4. The reports were prepared long before the Board reached its decision.   The Board used the Regional Board Report as a basis for discussion and, even when it agreed with the Regional Board's conclusion, it often did so as a result of an analysis of the flexible statutory factors completely different from that contained in the Regional Board Report.   Chairman Hartwig testified:

> "[W]hen the recommendation clearance of the Regional Board comes up on the Board agenda, the Board simply approves or disapproves the clearance. It does not adopt any of the memoranda that are before it.   It does not ratify or adopt any of these staff memoranda.   It simply, in the exercise of its judgment, says it is a clearance or it isn't a clearance.

---

[22] We decline to consider whether this case would be different if the Regional Boards had *de facto* decisional authority—*i. e.,* if, instead of making up its own mind in each case, the Board "reviewed" the Regional Board's recommendation under a clearly erroneous or some other deferential standard; or if the Board failed even to review the vast bulk of the reports, absent special circumstances.   There is no evidence in the record indicating that the Regional Boards had such *de facto* authority.   Indeed, the evidence is to the contrary.   In a recent review by the Comptroller General of 209 cases, the Board concurred in the Regional Board's recommendation only 85 times.   Comptroller General, Report to the Congress: The Operations and Activities of the Renegotiation Board 33–34 (B–163520—May 1973).

"And there is no Board-adopted document which you could call an opinion." App. 79.

The Regional Board Reports are thus precisely the kind of predecisional deliberative advice and recommendations contemplated by Exemption 5 which must remain uninhibited and thus undisclosed, in order to supply maximum assistance to the Board in reaching its decision. Moreover, absent indication that its reasoning has been adopted, there is little public interest in disclosure of a report. "The public is only marginally concerned with reasons supporting a [decision] which an agency has rejected, or with reasons which might have supplied, but did not supply, the basis for a [decision] which was actually adopted on a different ground." *NLRB* v. *Sears, Roebuck & Co., ante,* at 152. Indeed, release of the Regional Board's reports on the theory that they express the reasons for the Board's decision would, in those cases in which the Board had other reasons for its decision, be affirmatively misleading. *Sterling Drug, Inc.* v. *FTC,* 146 U. S. App. D. C. 237, 246–247, 450 F. 2d 698, 707–708 (1971); *International Paper Co.* v. *FPC,* 438 F. 2d 1349, 1358 (CA2), cert. denied, 404 U. S. 827 (1971). Accordingly, these reports are not "final opinions," they do fall within the protection of Exemption 5, and they are not subject to compulsory disclosure pursuant to the Act.

The Court of Appeals' attempt to impute decisional authority to Regional Boards by analogizing their final recommendations to the final decisions of United States district courts must fail. The decision of a United States district court, like the decision of the General Counsel of the NLRB discussed in *NLRB* v. *Sears, Roebuck & Co., ante,* at 158–159, n. 25, has real operative effect independent of "review" by a court of appeals: absent appeal by one of the parties, the decision has the force of law; and, even if an appeal is filed, the court

of appeals will be bound, within limits, by certain of the district court's conclusions.[23]  The recommendation of a Regional Board, by contrast, has no operative effect independent of the review: consideration of the case by the Board is not dependent on the decision by a party to "appeal"—such consideration is an inevitable event without which there is no agency decision; and the recommendation of the Regional Board carries no *legal* weight whatever before the Board—review by the latter is, as the Court of Appeals conceded, *de novo*.  Indeed, "review" is an entirely inappropriate word to describe the process by which the Board decides whether to issue a clearance following a recommendation to that effect by the Regional Board.  The latter's recommendation is functionally indistinguishable from the recommendation of any agency staff member whose judgment has earned the respect of a decisionmaker.  There is simply no sense in which Regional Boards have the power to make "final dispositions" and thus no sense in which the explanations of their recommendations can be characterized as "final opinions." [24]  See *NLRB* v. *Sears, Roebuck & Co., ante,* at 158–159.

In concluding that the Regional Board Reports are within the scope of Exemption 5, it is unnecessary to

----

[23] Fact determinations, for example, are reviewable under a "clearly erroneous" standard and certain legal judgments only for abuse of discretion.

[24] The distinction, between "recommendations" and "final opinions" subject to review, for Exemption 5 purposes is compelling.  In order that a decisionmaker consider all the arguments in support of all the options, those who recommend should be encouraged to make arguments which they would not make in public and with which they may even disagree.  However, if their recommendations were to have operative effect and thus qualify as decisions—even though subject to review—they should be *discouraged* from basing their decisions on arguments which they would not make publicly and with which they disagree.

decide whether, as respondent strenuously argues and the Court of Appeals concluded, the Regional Boards are themselves "agencies" for the purposes of the Act. Respondent and the court below proceed on the premise that the final written product of an "agency's" deliberations may never fall within Exemption 5, and reason that since the Regional Board Report is the final product of the Regional Board, it must therefore be disclosable *if* the Regional Board is a separate agency.[25] The premise is faulty, however, overlooking as it does the fact that Exemption 5 does not distinguish between *inter*-agency and *intra*-agency memoranda. By including *inter*-agency memoranda in Exemption 5, Congress plainly intended to permit one agency possessing decisional authority to obtain written recommendations and advice from a separate agency not possessing such decisional authority without requiring that the advice be any more disclosable than similar advice received from within the agency. Thus, if the Regional Boards are agencies for Class A purposes, their final recommendations are *inter*-agency memoranda; and, if they are not agencies separate from the Board, their recommendations are *intra*-agency memoranda. In either event, the Regional Boards' total lack of decisional authority brings their reports within Exemption 5 and prevents them from being "final opinions."

---

[25] We note in passing that, while the conclusion of the court below that the Regional Board's status as an agency stemmed from its power to issue "orders" in Class B cases finds support in the cases, *International Paper Co.* v. *FPC*, 438 F. 2d 1349, 1358–1359 (CA2), cert. denied, 404 U. S. 827 (1971); *Washington Research Project, Inc.* v. *Department of HEW*, 164 U. S. App. D. C. 169, 504 F. 2d 238 (1974), cert. pending, No. 74–736, the Court of Appeals never considered the possibility that the Regional Board might be an agency for Class B purposes and not for Class A purposes.

## B. *Division Reports*

It is equally clear that a division of the Board has no legal authority to decide. Once again, it may analyze and recommend, but the power to decide remains with the full Board. The evidence is uncontradicted that the Division Reports were prepared before the Board reached its decision, were used by the full Board as a basis for discussion, and, as the Chairman testified, were "prepared for and designed to assist the members of the Board in their deliberations"; nor is the discussion limited to the material and analysis contained in the Division Report. Following the discussion, *any* Board member may disagree with the report's conclusion or agree with it for reasons other than those contained in the report. Indeed, as Chairman Hartwig testified, it is likely that this will occur because of the highly judgmental nature of the Board's decisions given the number and generality of the statutory criteria. In any event, the reasoning of the Division Report is never adopted—though its conclusion may be—and no effort is made to reach agreement on anything but the result.

It is true that those who participate in the writing of the Division Report are among those who participate in the Board's decision, and that, human nature being what it is, they may not change their minds after discussion by the full Board. This creates a greater likelihood that the Board's decision will be in accordance with the Division Report than is the case with respect to a Regional Board Report and that, where the Board's decision is different, the Division Report will reflect the final views of at least one of the Board's members. See *NLRB* v. *Sears, Roebuck & Co., ante,* at 158–159, n. 25. However, this is not necessarily so. The Board obviously considers its discussion following the creation of the Division Report to be of crucial importance to its decision for, not-

withstanding the fact that a division is made up of a majority of the Board, it has been delegated no decisional authority. The member of the Board who wrote the report may change his mind as a result of the discussion or, consistent with the philosophy of Exemption 5, he may have included thoughts in the report with which he was not in agreement at the time he wrote it. The point is that the report is created for the purpose of discussion, and we are unwilling to deprive the Board of a thoroughly uninhibited version of this valuable deliberative tool by making Division Reports public on the unsupported assumption that they always disclose the final views of at least some members of the Board.[26]

---

[26] Since *all* of the members of the division are free to change their minds after deliberation and are free to place thoughts or arguments in the Division Reports which were only tentative in the first place, we need not reach the question whether a concurring or dissenting opinion must be disclosed even where no opinion expressing the view of the agency is written.

Respondent argues that Division Reports, as well as concurrences or dissents thereto, constitute "final opinions" of the Board or individual members of the Board, relying on a specific reference, assertedly made to such documents, in the House Report which accompanied the Act, H. R. Rep. No. 1497, 89th Cong., 2d Sess. (1966). That report, in speaking to the Committee's understanding of what is now codified as 5 U. S. C. § 552 (a)(2)(A), stated:

"[Subsection (A)] requires concurring and dissenting opinions to be made available for public inspection. The present law, requiring most final opinions and orders to be made public, implies that dissents and concurrences need not be disclosed. As a result of a Government Information Subcommittee investigation a number of years ago, two major regulatory agencies agreed to make public the dissenting opinions of their members, but a recent survey indicated that five agencies—including . . . the Renegotiation Board—do not make public the minority views of their members." H. R. Rep. No. 1497, *supra*, at 8.

This statement from the legislative history of the Act supports the proposition that Congress intended the Board to be subject to the

The effect of this decision is that, in those cases in which Statements and Summaries were not issued, the public will be largely uninformed as to the basis for decisions by the Renegotiation Board. Indeed, the decisions of both courts below—conceding as they both did the absence of decisional authority in either the Regional Boards or divisions of the statutory board—appear to have rested in the final analysis on the notion that the Renegotiation Board has an affirmative obligation under the Act to make public the reasons for its decisions; and that it must disclose its opinion *or the nearest thing to an opinion* in every case. However, Congress explicitly exempted the Renegotiation Board from all provisions of

Act's provisions, *Renegotiation Board* v. *Bannercraft Clothing Co.,* 415 U. S., at 16, and at first blush lends support to respondent's contention that Congress assumed, in passing the Act, that the Board was issuing "final opinions" in cases, that the Board was withholding concurrences and dissents to those final opinions, and that § 552 (a)(2)(A) was designed to put an end to this practice. Our research convinces us, however, that this language from the House Report is not to be so read. The "survey" referred to in the report was conducted in 1963 by the Foreign Operations and Government Information Subcommittee of the Committee on Government Operations of the House. The unpublished data gathered during that survey indicate that, in response to three questions submitted by the subcommittee to the Board, concerning its practices with respect to opinion writing and publication, the Board stated:

"Except as authorized in Renegotiation Board Regulations 1480.4 (a) (attached), opinions and orders of the Renegotiation Board are not published or made available to the public (see RBR [32 C. F. R. §] 1480.8) . . . ."

As our prior discussion of 32 CFR § 1480.8, n. 15, *supra*, makes clear, the "opinions" to which the Board referred were Statements and Summaries. Thus, the reference to concurring and dissenting opinions in the House Report, with respect to the Renegotiation Board, was not to Division Reports but was to nonexistent concurrences to and dissents from Statements and Summaries which were already being made public.

the Administrative Procedure Act except for the Public Information Section. 50 U. S. C. App. § 1221. Thus the opinion-writing section of the APA, 5 U. S. C. § 557—which itself applies only to "adjudication required by statute to be determined on the record after opportunity for an agency hearing" and even then only if the agency decision is not subject to *de novo* court review, 5 U. S. C. § 554—is inapplicable to Board decisions. The Freedom of Information Act imposes no independent obligation on agencies to write opinions. It simply requires them to disclose the opinions which they do write. *NLRB* v. *Sears, Roebuck & Co., ante,* p. 132. If the public interest suffers by reason of the failure of the Board to explain some of its decisions, the remedy is for Congress to require it to do so. It is not for us to require disclosure of documents, under the purported authority of the Act, which are not final opinions, which do not accurately set forth the reasons for the Board's decisions, and the disclosure of which would impinge on the Board's predecisional processes.

The judgment of the Court of Appeals is

*Reversed.*

Mr. Justice Douglas dissents.

Mr. Justice Powell took no part in the consideration or decision of this case.