**NATIONAL COUNCIL OF LA RAZA, New York Immigration Coalition, American Immigration Lawyers Association, National Immigration Law Center, National Immigration Forum, National Immigration Project of the National Lawyers Guild, Massachusetts Immigrant and Refugee Advocacy Coalition, American Civil Liberties Union, National Employment Law Project, Plaintiffs–Appellees,**

v.

**DEPARTMENT OF JUSTICE, Defendant–Appellant.**

**Docket No. 04–5474–CV.**

United States Court of Appeals, Second Circuit.

Argued: March 29, 2005.

Decided: May 31, 2005.

Omar C. Jadwat (Lucas Guttentag, Lee Gelernt, on the brief), American Civil Liberties Union, Immigrants' Rights Project, New York, NY, for American Civil Liberties Union; Michael J. Wishnie, American Civil Liberties Union, Immigrants' Rights Project, New York, NY, cooperating counsel, for American Civil Liberties Union; Christopher Dunn, Arthur Eisenberg, Donna Liberman, of counsel, New York Civil Liberties Union Foundation, New York, NY, for New York Civil Liberties Union Foundation; Linton Joaquin, National Immigration Law Center, Los Angeles, CA, of counsel, for National Immigration Law Center, Plaintiffs–Appellees.

Neil M. Corwin, Assistant United States Attorney (Sarah S. Normand, Assistant United States Attorney, on the brief) for David N. Kelley, United States Attorney for the Southern District of New York, Peter D. Keisler, Assistant Attorney General, Gregory G. Katsas, Deputy Assistant Attorney General, Douglas N. Letter, Irene M. Solet, Attorneys, Appellate Staff, Civil Division, Department of Justice, Washington, D.C., of counsel, for Department of Justice, Defendant–Appellant.

Before: FEINBERG, SACK, and KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge.

This case calls upon us to consider a conflict between two principles fundamental to our system of government: the public's right to know the policies by which it is governed, and the government's right to obtain frank and confidential counsel as those policies are formulated.

Plaintiffs-appellees, a coalition of advocacy organizations, brought this lawsuit pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking disclosure of an unpublished Office of Legal Counsel memorandum (the "OLC Memorandum" or "Memorandum"). The OLC Memorandum, which was prepared for the Department of Justice in April 2002, analyzes the question of whether state and local law enforcement may lawfully enforce certain provisions of federal immigration law. The district court (Kaplan, *J.*) held that the Department was required to produce the OLC Memorandum because, while the Memorandum met the threshold requirements for nondisclosure under FOIA's deliberative process exemption, 5 U.S.C. § 552(b)(5), the Department had waived that protection by adopting the Memorandum or incorporating it into official agency policy.

On appeal, the Department argues that it did not expressly adopt or incorporate the OLC Memorandum and that, accordingly, the Memorandum is shielded from disclosure under FOIA's deliberative process exemption. In the alternative, the Department argues that even if the deliberative process privilege does not protect the Memorandum, the Department is nonetheless entitled to withhold the Memorandum on the grounds of attorney-client privilege. We disagree on both counts and hold that: (1) the Department incorporated the OLC Memorandum into agency policy through its repeated reference to, and reliance on, the Memorandum; and (2) in this context, the attorney-client privilege does not shield the Memorandum from disclosure.

BACKGROUND

The instant dispute arose out of a change in policy instituted by the Department of Justice. Beginning in 1996, the Department took the position that state and local law enforcement lacked authority to enforce the civil, as opposed to criminal,

provisions of federal immigration law.[1] This position was set forth in a 1996 memorandum written by the Department's Office of Legal Counsel and published by the Department, which concluded that state and local police lack legal authority to detain individuals based solely on a suspicion of "civil deportability."

In 2002, however, the Department reversed course, taking the position that state and local law enforcement could, in fact, lawfully enforce the civil provisions of immigration law. The Department's change in policy was announced by then-Attorney General John Ashcroft at a June 5, 2002 press conference unveiling the "National Security Entry–Exit Registration System" ("NSEERS"). As the Attorney General explained, NSEERS is an initiative designed to "expand substantially America's scrutiny of those foreign visitors who may pose a national security concern and enter our country." In connection with this initiative, the Attorney General announced that information concerning aliens who overstay their visas or attempt to evade registration requirements—civil immigration violations—will be entered into the National Crime Information Center ("NCIC") database, a system that state and local police officers regularly check during traffic stops and other routine encounters. The Attorney General explained that state and local law enforcement could then voluntarily arrest those individuals on the basis of their immigration violations and transfer them to the custody of federal immigration officials.

In support of this policy, and during that June 5, 2002 press conference, the Attorney General made the first of a number of references to the OLC Memorandum that the plaintiffs here seek disclosed. Specifically, the Attorney General explained:

> When federal, state and local law enforcement officers encounter an alien of national security concern who has been listed in the NCIC ... federal law permits them to arrest the individual and transfer the individual to the custody of the INS.

> The Justice Department's Office of Legal Counsel has concluded that this narrow, limited mission we are asking state and local police to undertake voluntarily—arresting aliens who have violated criminal provisions of the Immigration and National[ity] Act, or civil provisions that render an alien deportable, those individuals who are listed on the NCIC—that narrow mission is within the inherent authority of the states.

In a similar vein, in response to a letter from one of the plaintiff organizations inquiring as to the authority of states and localities to enforce the civil provisions of immigration law, the Attorney General, by letter dated March 11, 2003, wrote:

> *Let me first state clearly the policy of the Department on this issue.* The Department's Office of Legal Counsel (OLC) previously opined that state and local law enforcement officials have inherent authority to make arrests for criminal immigration law violations generally. It has now additionally opined that they possess inherent authority to arrest individuals whose names have been entered into the [NCIC database] because they have both (1) violated civil provisions of the federal immigration laws that render them deportable and (2) been determined by federal authori-

---

1. Civil violations of immigration law include those violations—such as overstaying one's visa or entering the United States without proper documentation—that result in administrative proceedings. This is in contrast to criminal violations—for example, document fraud or illegal re-entry—that give rise to adjudication within the criminal justice system.

ties to pose special risks, either because they present national security concerns or because they are absconders who have not complied with a final order of removal or deportation. *Thus*, when state and local law enforcement officers encounter an alien who poses special risks and has been listed in the NCIC database for violating the [Immigration and Nationality Act], they may arrest that individual and transfer him to the custody of the Immigration and Naturalization Service (INS). The policy and the authority are no broader than this, and the narrow, limited mission that we are asking state and local police to undertake is a voluntary one.

(emphases added). Similar language appears in at least three other letters, one written by the Attorney General, the other two written by the Acting Assistant Attorney General and submitted to members of Congress.[2]

In June 2003, Kris Kobach, counsel to the Attorney General, gave what is perhaps the most detailed discussion of the OLC Memorandum during a presentation before the FBI's Criminal Justice Information Services Policy Advisory Board—a presentation attended by, *inter alia*, representatives from state and local police departments. Kobach began by stating that he would "sort of summarize" the Memorandum and then explained:

So, the question was, it was crystal clear that any criminal violation of the Immigration [and] Nationality Act could be a basis for an arrest by [a] state and local police officer. But what about a *civil violation*—of the Act? There was some ambiguity on this question. The last time the Office of Legal Counsel had looked at it was back in 1996. And since 1996, Congress had passed several acts all stating pretty clearly that there was no federal preemption. I don't want to get too much into the legalese of this, but [the OLC determined] that there was no federal preemption of state and local assistance for civil violations of the Act versus criminal violations of the Act. In addition, there were several Circuit court opinions in the 10th U.S. court of appeals, and that also raised the question rather, rather, crisply that perhaps we need to resolve this issue and just clear up the ... ambiguity[. I]n a nutshell [the OLC] concluded that there is no federal preemption, there is no difference between civil and criminal with respect to whether state laws are preempted—by the federal.... [T]he authority to make such arrest[s] is an

---

**2.** By letter dated May 13, 2003, the Attorney General wrote to the Deputy Superintendent of the Boston Police Department using almost identical language. The Attorney General noted that although the OLC "previously opined that states possess inherent authority to arrest aliens for criminal immigration law violations," "[i]n 2002, the OLC additionally opined that states also possess inherent authority to arrest aliens" who have, *inter alia*, "violated *civil* provisions of the federal immigration laws that render them deportable." (emphasis in the original). Another May 2003 letter, this one sent to Congressman Luis V. Gutierrez by Jamie E. Brown, the Acting Assistant Attorney General, uses identical language, and also notes that "the transfer of the immigration enforcement function from the Department of Justice to the Department of Homeland Security does not affect the OLC opinion." And in that same month, the Acting Assistant Attorney General responded to questions posed by the Congressman F. James Sensenbrenner, Jr., Chairman of the House Committee on the Judiciary, by quoting the Attorney General's June 5, 2002 press conference comments about the OLC Memorandum and explaining that the OLC opined in April of 2002 that "states also possess inherent authority" to enforce civil provisions of the immigration law and that the "federal government has never preempted this authority."

inherent authority possessed by the states.

Later in his remarks, Kobach continued:

But as far as the civil-criminal assumption, there really isn't any legal fiber underneath it in the immigration law, at least. And so in the OLC opinion it came out very clearly, and the Attorney General did announce the summary of what that opinion is.... At this point—well there are two things. One is that the OLC opinion doesn't say that immigration enforcement is an inherent authority of the states. It merely says, making an immigration arrest to assist the federal government lies within the inherent powers of the states.

Plaintiffs subsequently filed the instant lawsuit seeking, *inter alia*, to compel the production of documents relating to the Department's new position regarding the authority of states and localities to enforce civil violations of immigration law, only one of which—the 2002 OLC Memorandum—is relevant on appeal. On the Department's motion for summary judgment, the district court held, in relevant part, that the Department was required to disclose the OLC Memorandum. The district court noted that while the Memorandum fell within the deliberative process exception to FOIA's disclosure requirements and would normally not be subject to disclosure, the Department was nonetheless required to produce the Memorandum because the Department had, through the public statements of its representatives, incorporated the OLC Memorandum into Department policy. *See Nat'l Council of La Raza v. Dep't of Justice*, 339 F.Supp.2d 572, 585–87 (S.D.N.Y.2004).

The Department sought reconsideration of the district court's decision and urged the district court to review the OLC Memorandum *in camera*. On October 14, 2004, the district court granted the Department's motion in part, reaffirming its previous order that the bulk of the Memorandum be disclosed, but ordering the redaction of several sections of the OLC Memorandum that were unrelated to the Department's policy. *See Nat'l Council of La Raza v. Dep't of Justice*, No. 03 Civ. 2559, 2004 WL 2314455 at *1–2, 2004 U.S. Dist. LEXIS 20529, at *5–6 (S.D.N.Y. Oct. 14, 2004). This expedited appeal followed.[3]

## DISCUSSION

 We review *de novo* a district court's grant of summary judgment in a FOIA case. *See Halpern v. FBI*, 181 F.3d 279, 288 (2d Cir.1999). We also review *de novo* a district court's decision "to require partial production of documents following *in camera* review, in keeping with the spirit and the text of the FOIA and its presumption in favor of disclosure." *Tigue v. United States Dep't of Justice*, 312 F.3d 70, 75 (2d Cir.2002) (citation omitted).

FOIA was enacted in order to "promote honest and open government and to assure the existence of an informed citizenry [in order] to hold the governors accountable to the governed." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (internal quotation marks omitted). FOIA strongly favors a policy of disclosure, *see, e.g., Halpern*, 181 F.3d at 286, and requires the government to disclose its records unless its documents fall within one of the specific, enumerated exemptions set forth in the Act. *See* 5 U.S.C. § 552(a)(3), (b)(1)-(9); *Tigue*, 312 F.3d at 76. Consistent with FOIA's purposes,

---

3. Although the district court declined to grant a stay pending appeal, *see La Raza*, 2004 WL 2314455 at *2–3, 2004 U.S. Dist. LEXIS 20529, at *8–9, we subsequently granted such a stay.

these statutory exemptions are narrowly construed. *See Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001) ("[C]onsistent with the Act's goal of broad disclosure, these exemptions have been consistently given a narrow compass."(internal quotations and citations omitted)); *Local 3, Int'l Bhd. of Elec. Workers v. NLRB,* 845 F.2d 1177, 1180 (2d Cir.1988) (exemptions are "narrowly construed with all doubts resolved in favor of disclosure"). The Department bears the burden of demonstrating that any claimed exemption applies. *See Perlman v. United States DOJ,* 312 F.3d 100, 105 (2d Cir. 2002); *Arthur Andersen & Co. v. IRS,* 679 F.2d 254, 258 (D.C.Cir.1982).

At issue in the present appeal is whether the OLC Memorandum is protected under FOIA's fifth exemption ("Exemption 5"), which permits an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Courts have interpreted Exemption 5 to encompass traditional common-law privileges against disclosure, including the work-product doctrine, and executive, deliberative process and attorney-client privileges. *See, e.g., Grand Cent. P'ship, Inc.,* 166 F.3d at 481. The Department principally argues that the OLC Memorandum is protected by the "deliberative process privilege, a sub-species of work-product privilege that covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Tigue,* 312 F.3d at 76 (internal quotation marks and citations omitted).

■ The deliberative process privilege is designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials. It is based on "the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Klamath,* 532 U.S. at 8–9, 121 S.Ct. 1060. An inter— or intra-agency document may be withheld pursuant to the deliberative process privilege if it is: (1) "predecisional," *i.e.,* "prepared in order to assist an agency decisionmaker in arriving at his decision," and (2) "deliberative," *i.e.,* "actually ... related to the process by which policies are formulated." *Cuomo,* 166 F.3d at 482 (internal quotation marks and citations omitted). *See also Tigue,* 312 F.3d at 76; *Local 3, Int'l Bhd. of Elec. Workers,* 845 F.2d at 1180.[4]

■ Just because a document satisfies these requirements, however, does not mean that the deliberative process privilege bars its disclosure. An agency may be required to disclose a document otherwise entitled to protection under the deliberative process privilege if the agency has chosen "expressly to adopt or incorporate by reference [a] ... memorandum previously covered by Exemption 5 in what would otherwise be a final opinion." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 161, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). In such a circumstance, the document loses its predecisional and deliberative character, and accordingly, the deliberative process privilege no longer applies. *See Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C.Cir.1980) ("[E]ven if the document is predecisional at the time it is prepared, it can lose that sta-

---

**4.** Plaintiffs effectively concede on appeal that the OLC Memorandum satisfies these requirements, and we accordingly presume as much for the purposes of this appeal.

tus if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public."). As the Supreme Court wrote in *Sears*, when a document is adopted as agency policy or incorporated therein by reference:

> The probability that an agency employee will be inhibited from freely advising a decisionmaker for fear that his advice *if adopted*, will become public is slight. First, when adopted, the reasoning becomes that of the agency and becomes its responsibility to defend. Second, agency employees will generally be encouraged rather than discouraged by public knowledge that their policy suggestions have been adopted by the agency. Moreover, the public interest in knowing the reasons for a policy actually adopted by an agency supports [disclosure].

*Sears*, 421 U.S. at 161, 95 S.Ct. 1504.[5]

■ In the instant case, the repeated references to the OLC Memorandum made by the Attorney General and his high-ranking advisors,[6] the substance of their comments, and the way in which their comments were used—that is, to assure third parties as to the legality of the actions the third parties were being urged to take—are sufficient to establish that the Department incorporated the Memorandum into its new policy regarding state and local immigration law enforcement authority. The references to the OLC Memorandum demonstrate that the Department regarded the Memorandum as the exclusive statement of, and justification for, its new policy on the authority of states to enforce the civil provisions of immigration law. For example, in his June 2002 press conference, the Attorney General invoked the OLC Memorandum to justify the Department's policy change, noting expressly that the OLC had now—in contrast to the OLC and the Department's previous position—concluded that states possess the inherent authority to enforce the civil provisions of immigration law. In the Attorney General's March 2003 letter, the Attorney General wrote that he wanted to "state clearly the policy of the Department on this issue"—and then immediately referred to the OLC Memorandum. He concluded by writing that "[t]hus, when state and local law enforcement encounter an alien" listed in the NCIC, they have authority to make an arrest. Other letters from the Attorney General and his staff contained similar language.

---

**5.** While the Department urges us to adopt a bright-line test—whereby a document may be deemed expressly adopted or incorporated only in the event that an agency, in essence, uses specific, explicit language of adoption or incorporation—such a test is inappropriate because courts must examine *all* the relevant facts and circumstances in determining whether express adoption or incorporation by reference has occurred. *See, e.g., Tigue*, 312 F.3d at 81. *See also Arthur Andersen & Co.*, 679 F.2d at 258; *Taxation With Representation Fund v. IRS*, 646 F.2d 666, 678 (D.C.Cir. 1981); *Niemeier v. Watergate Special Prosecution Force*, 565 F.2d 967, 973 (7th Cir.1977).

**6.** The Department argues, in substance, that we should disregard any statements made by individuals other than the Attorney General on the grounds that those employees lack the authority to set Department policy and therefore could not adopt or incorporate the OLC Memorandum through their statements. However, even assuming *arguendo* that these employees do not themselves have the power to adopt or incorporate the OLC Memorandum, their statements serve as evidence of the Department's position on the matter. Moreover, there is absolutely no suggestion in the record that any of the above-described statements made by Department employees, in their capacity as Department representatives, were unauthorized or inaccurate statements of the Department's position.

Finally, there are the comments of Kris Kobach, Counsel to the Attorney General, at a presentation before, *inter alia,* representatives from state and local law enforcement, that is, the very audience to whom the Department's new policy was aimed. Kobach relied on one and only one source as a justification for the Department's policy: the OLC Memorandum. And he did not merely refer to the Memorandum's conclusions; he gave a self-described "overview" of its contents. To wit, Kobach stated:

> So, the question was, it was crystal clear that any criminal violation of the Immigration [and] Nationality Act could be a basis for an arrest by [a] state and local police officer. But what about a civil violation—of the Act? There was some ambiguity on this question. The last time the Office of Legal Counsel had looked at it was back in 1996. And since 1996, Congress had passed several acts all stating pretty clearly that there was no federal preemption. I don't want to get too much into the legalese of this, but [the OLC determined] that there was no federal preemption of state and local assistance for civil violations of the Act versus criminal violations of the Act. In addition, there were several Circuit court opinions in the 10th U.S. court of appeals, and that also raised the question rather, rather, crisply that perhaps we need to resolve this issue and just clear up the ... ambiguity[. I]n a nutshell [the OLC] concluded that there is no federal preemption, there is no difference between civil and criminal with respect to whether state laws are preempted—by the federal.... [T]he authority to make such arrest[s] is an inherent authority possessed by the states.

The foregoing statements make clear that the Attorney General and his high-level staff made a practice of using the OLC Memorandum to justify and explain the Department's policy and to assure the public and the very state and local government officials who would be asked to implement the new policy that the policy was legally sound. Moreover, these statements must be understood in context: The Department had announced a *reversal* of its policy, and the Department publicly and repeatedly depended on the Memorandum as the primary legal authority justifying and driving this change, and the legal basis therefor. Thus, given the facts and context, the Department cannot satisfy its burden of proving that the deliberative process exemption to FOIA applies to the document here sought. *See Taxation With Representation Fund,* 646 F.2d at 678 (noting that deliberative process privilege may evaporate if a document "is used by the agency in its dealings with the public" (quoting *Coastal States Gas,* 617 F.2d at 866)); *Montrose Chem. Corp. v. Train,* 491 F.2d 63, 70 (D.C.Cir.1974) (explaining that disclosure is required "where a decision-maker has referred to an intraagency memorandum as a *basis* for his decision," since "once adopted as a rationale for a decision, the memorandum becomes part of the public record"). *See also Arthur Andersen & Co.,* 679 F.2d at 258.

To be sure, had the Department simply adopted only the conclusions of the OLC Memorandum, the district court could not have required that the Memorandum be disclosed. Mere reliance on a document's conclusions does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference. In *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 421 U.S. 168, 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975), for example, plaintiffs sought reports prepared by two subordinate divi-

sions of the Renegotiation Board, an agency established to ascertain whether government contractors had received, and were required to refund, "excessive profits." The reports were given to the Board, which simply ordered or denied a "clearance"—a determination that no excessive profits were realized—without any substantive reasoning or even a reference to the reports. *Id.* at 185–86, 95 S.Ct. 1491. Moreover, the Board was in no way bound by the reports' recommendations, nor the reasoning contained therein; the reports were simply prepared for the Board as an aid to Board deliberation. *Id.* at 177, 95 S.Ct. 1491. Under these circumstances, the Supreme Court held that the reports had not been adopted or incorporated by the Board, as "the evidence utterly fails to support the conclusion that the reasoning in the reports is adopted by the Board as its reasoning, even when it agrees with the conclusion of a report...." *Id.* at 184, 95 S.Ct. 1491.

Certainly, in situations like *Grumman,* where an agency, having reviewed a subordinate's non-binding recommendation, makes a "yes or no" determination without providing any reasoning at all, a court may not infer that the agency is relying on the reasoning contained in the subordinate's report. *See Casad v. United States Dep't of Health and Human Servs.,* 301 F.3d 1247, 1252–53 (10th Cir.2002) (holding that a report relied upon by agency in determining whether or not to award a grant had not been adopted, as "[t]here is no indication in the record that, in funding the ... grant, the [agency] expressly adopted the reasoning" of the report); *Afshar v. Dep't of State,* 702 F.2d 1125, 1143 n. 22 (D.C.Cir.1983) (noting that "[i]f the agency merely carried out the recommended decision without explaining its decision in writing, we could not be sure that the memoranda accurately reflected the decisionmaker's thinking"). Courts have similarly honored the deliberative process privilege where an agency has only casually referred to a document, because a casual reference to a privileged document does not necessarily imply that an agency agrees with the reasoning contained in those documents. *See Tigue,* 312 F.3d at 81 (holding that two minor references to a document protected by the deliberative process privilege were insufficient to establish adoption or incorporation); *Access Reports v. Dep't of Justice,* 926 F.2d 1192, 1197 (D.C.Cir.1991) (one "confused statement" that might have been a reference to the document at issue "fell far short of the *express* adoption required by *Sears* "). *See also Common Cause v. IRS,* 646 F.2d 656, 660 (D.C.Cir.1981). Rather, there must be evidence that an agency has *actually* adopted or incorporated by reference the document at issue; mere speculation will not suffice.

The instant case, however, is different. The record makes clear that the Department embraced the OLC's reasoning as its own. The OLC Memorandum was "used by the agency in its dealings with the public," *Coastal States Gas,* 617 F.2d at 866, as the sole legal authority for the Department's claim that its new policy had a basis in the law; indeed, the Department repeatedly invoked the OLC Memorandum to assure those outside of the agency that its policy was lawful and to encourage states and localities to take actions that the Department desired. *See supra.* The Department therefore relied on the OLC Memorandum not only to justify what it, the Department, *would* do as a result of its deliberations, but also to justify what a third party—"state and local law enforcement"—*should* and *could* lawfully do. The latter use of the OLC Memorandum by Department personnel is powerful evidence that the Department explicitly adopted the OLC Memorandum as part of

its policy. In these circumstances, "the public can only be enlightened by knowing what the [agency] believes the law to be." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C.Cir.1997). To quote again from *Sears*,

> The public is only marginally concerned with reasons supporting a policy which an agency has rejected, or with reasons which might have supplied, but did not supply, the basis for a policy which was actually adopted on a different ground. In contrast, the public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted. These reasons, if expressed within the agency, constitute the "working law" of the agency....[7]

*Sears*, 421 U.S. at 152–53, 95 S.Ct. 1504. Here, as the district court cogently concluded, "The Department's view that it may adopt a legal position while shielding from public view the analysis that yielded that position is offensive to FOIA." *La Raza*, 339 F.Supp.2d at 587.

▮▮▮ Finally, the Department argues that even if the OLC Memorandum is not entitled to protection under the deliberative process privilege, it may nonetheless withhold the Memorandum on the grounds that the Memorandum is independently protected from disclosure by the attorney-client privilege, also an exception to FOIA's disclosure requirements. *See In re Grand Jury Investigation*, 399 F.3d 527, 533 (2d Cir.2005) (noting that "[c]ourts have construed Exemption 5 as covering materials protected by the attorney-client privilege"). We disagree. Like the deliberative process privilege, the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy. In such circumstances, the principal rationale behind the attorney-client privilege—"to promote open communication between attorneys and their clients so that fully informed legal advice may be given," *In re John Doe, Inc.*, 13 F.3d 633, 635–36 (2d Cir.1994)—like the principal rationale behind the deliberative process privilege, evaporates; for once an agency adopts or incorporates document, frank communication will not be inhibited. Indeed, once an attorney's (or employee's) recommendation becomes agency law, the agency is then responsible for defending that policy, and the attorney (or employee) "will generally be encouraged rather than discouraged" by public knowledge that their policy suggestions or legal analysis have been adopted by the agency. *See Sears*, 421 U.S. at 161, 95 S.Ct. 1504. Disclosure is therefore appropriate in such circumstances. *See Falcone v. IRS*, 479 F.Supp. 985, 990 (E.D.Mich.1979) (stating that adopted documents are not protected by the attorney-client privilege, and noting that "broad attorney-client privilege would permit legal opinions, recognized as authoritative interpretations within the agency, to be hidden from the public. Further, it is clear that the purpose of the privilege

---

7. Moreover, to the extent that the Department argues that the substance of the OLC Memorandum goes beyond the scope of what the Department actually adopted or incorporated, we acknowledge that an agency may adopt or incorporate only part of an otherwise-protected document. In such a situation, redaction—rather than complete non-disclosure—is the appropriate remedy. Here, the district court addressed precisely this concern and, we find, properly redacted "an introductory section that reveals the process of policy formulation within the Department as well as a section analyzing an issue to which the Department has not referred in any public statements brought to the [district court's] attention." *Nat'l Council of La Raza*, 2004 WL 2314455, at *2, 2004 U.S. Dist. LEXIS 20529, at *6. The rest of the Memorandum consists of the reasoning referenced and relied on by Department officials and, as the district court properly held, should be disclosed.

is not to protect communications which are statements of policy and interpretations adopted by the agency."). *See also Niemeier*, 565 F.2d at 974 ("Where litigation is foreclosed as an option and the agency expressly chooses to make use of legal memoranda in its final decision, this choice eliminates any claim of attorney work product privilege.... Under these circumstances, such documents are not the ideas and theories which go into the making of the law, they are the law itself, and as such should be made available to the public.") (footnotes and internal quotation marks omitted).[8]

We cannot allow the Department to make public use of the Memorandum when it serves the Department's ends but claim the attorney-client privilege when it does not. Because the Department, in light of all the facts and circumstances set forth above, incorporated the OLC Memorandum into the Department's policy, the attorney-client privilege cannot here be invoked to bar that Memorandum's disclosure.[9]

### CONCLUSION

For the foregoing reasons, the order of the district court is affirmed.

---

[8.] This is consistent with FOIA's general requirement that "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register" must be disclosed. 5 U.S.C. § 552(a)(2)(B).

[9.] Because we conclude that the OLC Memorandum is not exempt from disclosure under Exemption 5, we need not reach plaintiffs' alternative argument that the Department waived any privilege by releasing the Memorandum outside of the executive branch.