530 F.2d 612
 92 L.R.R.M. (BNA) 2152, 78 Lab.Cas. P 11,385
 KENT CORPORATION, Plaintiff-Appellee,
v.
NATIONAL LABOR RELATIONS BOARD and John S. Irving, in his
official capacity as General Counsel of the
National Labor Relations Board,
Defendants-Appellants.
 No. 74--1710.
 United States Court of Appeals,
Fifth Circuit.
 April 21, 1976.
 
 Elliott Moore, Deputy Associate Gen. Counsel, Abigail Cooley, Asst. Gen. Counsel for Special Litigation, Elinor Hadley Stillman, N.L.R.B., Washington, D.C., for defendants-appellants.
 C. V. Stelzenmuller, Birmingham, Ala., for plaintiff-appellee.
 Lawrence B. Kraus, Labor Relations Counsel, Richard B. Berman, Chamber of Commerce, Washington, D.C., Gerard C. Smetana, Jerry Kronenberg, Julian D. Schreiber, Chicago, Ill., John G. Weinmann, New Orleans, La., for other interested parties.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before TUTTLE, GODBOLD and GEE, Circuit Judges.
 BODBOLD, Circuit Judge:
 
 
 1
 This is a suit for disclosure of public records under the Freedom of Information Act (FOIA), 5 U.S.C. § 552.[1] The documents in issue are 'Final Investigation Reports' prepared by staff members of the NLRB's Tenth Regional Office after they investigated unfair labor practice charges filed against plaintiff Kent. Some of these reports contain marginal notations made by the Regional Director and his staff during a meeting at which they discussed the charges. Kent contends that these documents with their notations, insofar as they constitute decisions by the Regional Director not to issue an unfair labor practice complaint, are disclosable under subsections (a)(2)[2] and (a)(3)[3] of the FOIA. The government contends that the materials are protected from disclosure by Exemptions 5 and 7[4] of the Act. After an in camera inspection, the District Court ordered disclosure. We reverse.
 
 I. The Origins of the Documents in Issue
 
 2
 Many of the issues in this case are governed by a recent Supreme Court decision applying the FOIA to the Board. NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) (hereinafter Sears). We thus find it apt to begin our discussion with background information quoted from that opinion:
 
 
 3
 Under the Labor Management Relations Act of 1947, 29 U.S.C. § 151 et seq., the process of adjudicating unfair labor practice cases begins with the filing by a private party of a 'charge,' 29 U.S.C. §§ 153(d) and 160(b); 29 CFR § 101.2; Auto Workers v. Scofield, 382 U.S. 205, 219, 86 S.Ct. 373, 382, 15 L.Ed.2d 272 (281); NLRB v. Indiana and Michigan Electric Co., 318 U.S. 9, 17--18, 63 S.Ct. 394, 399--400, 87 L.Ed. 579 (585). Although Congress has designated the Board as the principal body which adjudicates the unfair labor practice case based on such charge, 29 U.S.C. § 160, the Board may adjudicate only upon the filing of a 'complaint'; and Congress has delegated to the Office of General Counsel 'acting for the Board' the unreviewable authority to determine whether a complaint shall be filed. 29 U.S.C. § 153(d); Vaca v. Sipes, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (853). In those cases in which he decides that a complaint shall issue, the General Counsel becomes an advocate before the Board in support of the complaint. In those cases in which he decides not to issue a complaint, no proceeding before the Board occurs at all. The practical effect of this administrative scheme is that a party believing himself the victim of an unfair labor practice can obtain neither adjudication nor remedy under the labor statute without first persuading the Office of General Counsel that his claim is sufficiently meritorious to warrant Board consideration.
 
 
 4
 In order to structure the considerable power which the administrative scheme gives him, the General Counsel has adopted certain procedures for processing unfair labor practice charges. Charges are filed in the first instance with one of the Board's 31 Regional Directors, to whom the General Counsel has delegated the initial power to decide whether or not to issue a complaint. 29 CFR §§ 102.10, 101.8. A member of the staff of the Regional Office then conducts an investigation of the charge, which may include interviewing witnesses and reviewing documents. 29 CFR § 101.4. If, on the basis of the investigation, the Regional Director believes the charge has merit, a settlement will be attempted, or a complaint issued. If the charge has no merit in the Regional Director's judgment, the charging party will be so informed by letter with a brief explanation of the reasons. 29 CFR §§ 101.8, 102.15, 101.6, 102.19. In such a case, the charging party will also be informed of his right to appeal within 10 days to the Office of the General Counsel in Washington, D.C. 29 CFR §§ 101.6, 102.19.
 
 
 5
 421 U.S. at 138--39, 95 S.Ct. at 1510--1511, 44 L.Ed.2d at 40--41 (footnote omitted). Thus when the Regional Director believes that the charging party's position does not merit the filing of a complaint, that determination is final, subject only to the limited possibilities for intervention by the General Counsel's office. Such intervention led to the writing of the documents at issue in Sears. In the present case, however, we are solely concerned with procedures at the Regional Offices, where nearly all cases are resolved without the participation of Washington officials.[5]
 
 
 6
 During the spring and summer of 1973, various unfair labor practice charges were filed with the Board's Tenth Regional Office in Atlanta against Kent. Some of the charges were filed by a labor organization and other charges by individual employees of Kent. Donald E. Howard, the Resident Officer in Birmingham, investigated the charges in three of the cases (Nos. 10--CA--10077, --10091, and --10099), interviewing witnesses and gathering documentary evidence. He then wrote a 'Final Investigative Report' summarizing the evidence and recommending disposition of the charges. The report was discussed at a meeting on May 30, attended by Howard; the Regional Director, Walter C. Phillips; and two Regional Office attorneys. As the participants discussed the report, section by section, Phillips gave oral directions as to which alleged violations should be pursued (with a view towards settlement or complaint) and which should be dropped (by inducing a withdrawal of the charge, or by dismissal). Howard, Phillips, and possibly the other attorneys made notes in the margins of their copies of the report. Phillips filed his copy away;[6] Howard gave his to Donald W. Davis, an attorney in the Birmingham office, who drafted a complaint based on some, though not all, of the charges that had been discussed.[7] Before the complaint had been issued, an investigative report on another case (No. 10--CA--10179) was completed by a Board field examiner. Phillips decided that this charge had merit and directed that the cases should be consolidated. The ensuing complaint was issued on June 20.
 
 
 7
 Another charge was filed against Kent on July 11, and a similar sequence of events followed. Davis investigated and wrote a report on the allegations; he, Phillips, and other attorneys discussed it at an agenda committee meeting, where Phillips decided that some of the charges should be dismissed and other charges included in the complaint. Again both Davis and Phillips made notes on their copies of the investigative reports to reflect the decisions. Davis wrote a 'partial dismissal letter' to the charging party, explaining why some of the allegations would not become the subjects of a complaint. At the same time, using his marked copy of the report, he drafted a complaint based on the remaining allegations. This complaint, consolidated with the previous one, was issued on August 22 and became the basis for subsequent litigation, culminating in NLRB v. Kent Corp., slip opin. p. 2764, 530 F.2d 610 (C.A.5, 1976), a companion case to this one.
 
 
 8
 During the pendency of the unfair labor practice litigation, on September 24, 1973, Kent sent the Board a written request for documents, invoking the FOIA. Seven categories of records were requested, including the materials now in issue.[8] Upon receiving no response to the request, Kent filed suit in District Court on November 16, and moved for a preliminary injunction three days later.
 
 
 9
 In support of its motion, Kent set forth its reasons for wanting access to the materials. It alleged that the unfair labor practice investigation had pointed up
 
 
 10
 arbitrariness and abuse of discretion on the part of Board agents. There were a number of individuals named in the unfair labor practice complaint as having been improperly discriminated against by plaintiff, on facts no different from numerous other individuals who were eliminated from the complaint by amendment or withdrawal approved by the Board. Plaintiff needs the documents . . . in order to determine the rational basis, if any, for selecting those individuals as to whom complaint was issued, since even after the hearing no discernible basis therefor exists.
 
 
 11
 Kent also claimed that 'the investigation of the unfair labor practices was tainted by hostility (against Kent's president and its counsel), race prejudice, coercion or undue influence on witnesses, and entrapment.' Kent hoped the documents would confirm the attitudes lying behind these alleged indications of improper conduct.
 
 
 12
 The District Court granted the preliminary injunction. Subsequently, on February 27, 1974, it denied the government's motion to vacate and directed the defendants to produce 'those parts of the investigation reports and the marginal notes which constitute the final decisions to prosecute or not to prosecute.' Defendants appeal from that order.
 
 II. The FOIA--General Principles
 
 13
 The Freedom of Information Act has been discussed by this court several times before.[9] The Act 'establish(es) a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.' S.Rep.No.813, 89th Cong., 1st Sess. 3 (1965). Thus, all federal agency records are prima facie disclosable to any member of the public who requests and 'reasonably describes' them. § 552(a)(3).[10] If the materials are among those described by subsection (a)(2), including 'final opinions . . . made in the adjudication of cases' and 'instructions to staff that affect a member of the public,' the agency has an additional duty: it must not only release the documents to the public, but also maintain and make available current indexes listing those materials. The agency can escape these responsibilities only if it sustains the burden of showing that the documents fall within one or more of the exemptions in subsection (b). Two such exemptions, those pertaining to intra-agency memoranda (Exemption 5)[11] and investigatory records (Exemption 7),[12] are said to apply in this case.
 
 
 14
 Sears is the preeminent precedent applying this Act to the NLRB. The plaintiff sought memoranda which the General Counsel had issued to the Regional Offices. These memoranda told Regional Directors how to dispose of certain cases and expressed reasons to justify those outcomes. The Supreme Court stated that Exemption 5 embodies at least two common-law privileges for government memoranda. First, it preserves in the FOIA context the 'executive privilege' protecting predecisional communications, because "frank discussion of legal and policy matters' in writing might be inhibited if the discussion were made public; and . . . the 'decisions' and 'policies formulated' would be the poorer as a result.'[13] Second, Exemption 5 preserves the attorney work product privilege announced in Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Accordingly, the Court held that memoranda of the General Counsel directing the filing of a complaint were exempt from disclosure, since they were work products, and, in any event, did not inform the public about agency law (since an adjudication of the charge was still to come). On the other hand, the Court held that 'final opinions . . . made in the adjudication of cases,' § 552(a)(2)(A), are never within Exemption 5. The Court pointed out that the FOIA executive privilege had generally been deemed inapplicable to post-decisional documents such as 'final opinions', since disclosure of communications made after a decision can hardly injure that decision, and also because the public is vitally interested in knowing the reasons for agency policy. The category of 'final opinions,' according to the Court, included memoranda by the General Counsel which explained decisions not to file a complaint. The Court said that such a memorandum accomplishes 'as 'final' a 'disposition' as an administrative decision can--representing, as it does, an unreviewable rejection of the charge filed by the private party.'
 
 
 15
 Kent now concedes, in light of Sears, that the District Court's order can no longer be sustained insofar as it required release of the Regional Director's decisions that a complaint should issue. But Kent vigorously maintains that under Sears the Regional Director's decisions not to issue a complaint are disclosable 'final opinions.' Thus, the questions before us are whether the investigative reports with their markings, or any portion thereof, are 'final opinions,' and, if not, whether they should be deemed outside of Exemption 5 for any other reason.
 
 
 16
 III. 'Final Opinions'
 
 
 17
 We look first at the language of subsection (a)(2). Defendants do not deny that the Regional Office is an 'agency' of the United States;[14] nor can they plausibly maintain, after Sears, that the Regional Director's decisions were not reached in the 'adjudication' of 'cases.' See 421 U.S. at 158--59, 95 S.Ct. at 1520, 44 L.Ed.2d at 51--52. We also believe that these decisions possess the 'finality' demanded by subsection (a)(2)(A), notwithstanding the charging party's right to appeal a dismissal to the General Counsel's office in Washington. Paraphrasing apt language from Sears, 421 U.S. at 158--59 n. 25, 95 S.Ct. at 1520, 44 L.Ed.2d at 52 n. 25: '(T)he possibility that the decision reached' by the Regional Director 'may be overturned in an Appeals Memorandum . . . does not affect its finality for our purposes. The decision . . ., in the absence of an appeal filed by the charging party, has real operative effect, as much as does every order issued by a United States District Court which might, if appealed, be overturned by a United States Court of Appeals.' The Regional Director, like the General Counsel in Sears, has power to make a final disposition of a claim by dismissing it. This is effective law-making power, and the thrust of subsection (a)(2) is toward allowing the public to know what 'the law' is.[15]
 
 
 18
 Despite these considerations, Kent's argument has a fatal flaw: the materials at issue in this case are not 'opinions.' We are guided in this regard by Renegotiation Board v. Grumman Aircraft Engineering Corp., 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975), a companion case to Sears. In Grumman the plaintiff sought, inter alia, reports prepared by 'Divisions' or subcommittees composed of three of the Renegotiation Board's five members. The full Board used these reports as a springboard for discussion in the course of deciding whether to require contractors to refund 'excessive profits' to the government. The Court held that these division reports were not to be treated as final opinions of the Board. For, after discussing a written memorandum's rationale, the Board might act for an entirely different reason; indeed, the individual author of the report might change his viewpoint after discussion and accept arguments quite different from the (possibly quite tentative) ideas he had expressed in writing. Echoing the philosophy of Exemption 5, the Court declared itself 'unwilling to deprive the Board of a thoroughly uninhibited version of this valuable deliberative tool.'
 
 
 19
 In the present case no document in controversy purports to explain why the Regional Director decided not to issue a complaint in the various instances. The 'Final Investigation Reports' as originally written do not do so. They express the tentative views of the Birmingham attorneys who wrote them. They state reasons that could account for Regional Director Phillips' decisions, but there is no assurance that Phillips accepted those reasons. They are precisely the sort of predecisional documents that Sears identifies as the intra-agency memoranda mentioned in the FOIA. As we held in Wu v. National Endowment for Humanities, 460 F.2d 1030, 1032 (C.A.5, 1972), 'advice, recommendations, opinions, and other subjective material are protected' by Exemption 5.
 
 
 20
 The further question is whether the presence of the notations made in the margins of these reports changes anything. Of course, disclosure of the notations by themselves would be a futile endeavor, even assuming they are not exempt; apart from their context, they are gibberish. We understand Kent to argue, however, that the whole is greater than its parts--that these reports and their marginal annotations together (perhaps with the latter 'incorporating by reference' the former) are 'final opinions.' We think they are not. From our in camera inspection of the documents, we can say that these ambiguous scribbles do not clearly show the basis of the decisions in question. But even if these markings were both coherent and lucid, the case could come out no differently. There would be no assurance that they represented the institutional view of the Regional Office. Even Phillips' own copies of the reports might, for all we could tell, be inscribed with only some of the reasons behind his choice. And some of the points to be found in the margins might be tentative conclusions, put on paper only while he was on the way to making up his mind. A fortiori, we could depend on Davis' and Howard's copies of the reports to reveal only part of 'the decision,' not necessarily all of it. The copies would not--could not--show the extent (if any) to which the Regional Director conveyed his views by oral statements that were never recorded.
 
 
 21
 Under the District Court's order the agency would have had to comb through the reports and pick out those sentences or paragraphs which represented the ultimate basis of its actions; to articulate its reasoning more coherently and logically than the reports, and later the handwritten notes, themselves did; in short, to create a final opinion. But '(t)he Freedom of Information Act imposes no independent obligation on agencies to write opinions. It simply requires them to disclose the opinions which they do write.' Grumman, 421 U.S. at 192, 95 S.Ct. at 1504, 44 L.Ed.2d at 75.[16]
 
 
 22
 The policies that Exemption 5 was meant to foster are illustrated, ironically, by Kent's own motives for seeking these documents. Kent claims that it needs access to the reports in order to determine whether Board personnel are hostile and prejudiced against its cause. Thus in the unfair labor practice litigation Kent is trying to probe the mental processes and motives of the individual decision-maker, rather than to question the objective legal validity of the institutional decision. In the circumstances of this case,[17] this effort is inconsistent with a basic principle of administrative law. The Supreme Court announced the general bar against probing mental processes in the Morgan cases,[18] and decisions of this Circuit have held it applicable to NLRB prosecutorial processes.[19] The point is significant in construing Exemption 5,[20] which was enacted to free decision-makers from the 'threat of cross-examination in a public tribunal,' Ackerley v. Ley, 137 U.S.App.D.C. 133, 420 F.2d 1336, 1341 (1969); see EPA v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). In view of Kent's position, it is hardly speculative to say that decision-makers would be exposed to just such threats if intra-agency advice memoranda were generally held disclosable whenever they could arguably be viewed as 'final opinions.' ', a court which does not consider probing mental processes part of its reviewing task will hardly read (Exemption 5's) language as requiring disclosure of documents for solely that purpose.'[21]
 
 
 23
 We also cannot overlook the fact that one of the Regional Director's decisions not to issue a complaint was indeed expressed in an opinion. In Case No. 10--CA--10272 the charging party (the Boilermakers' Union) declined to withdraw the allegations that the Regional Director had disapproved. Consequently a letter of dismissal was issued, formally notifying the union that certain charges would not be pursued and explaining reasons for the decision. It was drafted by Howard and signed by the then Acting Regional Director. Here was a document that was truly post-decisional and did enunciate a basis for the agency's conclusion. Had an appeal been taken to Washington, this letter would have expressed to the General Counsel the Regional Office's view of the matter. When laid against this opinion, the marked-up investigation reports appear all the more clearly to be 'predecisional.'[22]
 
 
 24
 IV. 'Instructions to Staff'
 
 
 25
 We turn briefly to the question of whether these documents are made disclosable by subsection (a)(2)(C), under which agencies must release and index 'administrative staff manuals and instructions to staff that affect a member of the public.'[23] On a first reading of the statute it might be quite tempting to describe the Birmingham attorneys' handwritten records of Phillips' directions as 'instructions to staff.' Moreover, in Stokes v. Brennan, 476 F.2d 699 (C.A.5, 1973), this court adopted a broad reading of subsection (a)(2)(C). We noted from the legislative history that Congress had added the adjective 'administrative' in order to limit the scope of this provision, but that only "information which, if known to the public, would significantly impede the enforcement process" was thereby excluded.
 
 
 26
 However, we need not decide whether the materials in controversy fall within this subsection. As previously suggested and as further discussed below, these reports are the kind of memoranda covered by Exemption 5; and, in any collision between the two provisions, subsection (a)(2)(C) must yield, because the Act 'does not apply' to exempted material. § 552(b); Sears, 421 U.S. at 154 n. 21, 95 S.Ct. at 1518, 44 L.Ed.2d at 49 n. 21. Thus we can narrow our consideration to the question of whether 'instructions to staff' automatically fall outside of Exemption 5. Such an interpretation might be suggested by the following language from Sears: 'We should be reluctant . . . to construe Exemption 5 to apply to the documents described in 5 U.S.C. § 552(a)(2); and with respect at least to 'final opinions' . . . we hold that Exemption 5 can never apply.'
 
 
 27
 Several factors prompt us to hold that, unlike the situation with final opinions, a document's status as 'instructions to staff' under subsection (a) (2)(C) does not determine whether the document is within Exemption 5. First, despite its expressed 'reluctance,' the Supreme Court implicitly held in Sears that there is some overlap between the two statutory provisions: for it found that the work-product privilege brought certain memoranda into the exemption 'whether or not' those memoranda were also 'instructions to staff.' Second, the conclusion we reach is consistent with our analysis in Stokes, where we treated subsections (a)(2)(C) and (b)(5) as raising entirely different technical issues. Third, a different conclusion would undercut the fifth exemption. 'Predecisional' processes will quite regularly involve instructions to staff in the literal sense--if only an 'instruction' to prepare a formal expression of the agency's views--and yet disclosure of those instructions would obviously tend to impinge on the deliberative process.
 
 
 28
 V. 'Available by Law in Litigation'
 
 
 29
 Thus far we have expressed the view that these documents are not within subsection (a)(2); in operational terms we have concluded that the Regional Office's 'final investigation reports,' with or without marginal notes, do not have to be indexed. We next consider whether, and how far, Exemption 5 shields these records from the purview of the general disclosure provision, subsection (a)(3). As we have already made clear, the reports contain analyses and recommendations that are protected by the executive privilege within Exemption 5. It does not necessarily follow, however, that the reports may be withheld in their entirety. We must determine whether they contain any 'reasonably segregable portion' that is not within any exemption. § 552(b). And it is now established that the executive privilege does not protect 'purely factual material appearing in (requested) documents in a form that is severable without compromising the private remainder of the documents.' EPA v. Mink, 410 U.S. 73, 91, 93 S.Ct. 827, 838, 35 L.Ed.2d 119, 134 (1973). If only executive privilege were claimed, it might be necessary to remand the cause for dissection and partial release of the reports.[24]
 
 
 30
 But the Board's contentions are broader. We must 'construe Exemption 5 to exempt those documents, and only those documents, normally privileged in the civil discovery context,' Sears, 421 U.S. at 149, 95 S.Ct. at 1515, 44 L.Ed.2d at 46, and the Board relies on three distinct privileges here: the executive privilege, the attorney work product privilege, and (apparently) the so-called informer's privilege.[25]
 
 
 31
 We can dispose of the problem at hand by applying the work product privilege alone. Apart from the Supreme Court's cautious discussion in Sears, this is a rather unexplored corner of FOIA law, and it is therefore necessary to deal with some basics. The fundamental principles, of course, come from Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), where the Court said, in part:
 
 
 32
 In performing his various duties, . . . it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. . . . Were (work product) materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.
 
 
 33
 329 U.S. at 510--11, 67 S.Ct. at 393--394, 91 L.Ed. at 462. More concisely we have said that the rule is 'based on the public policy of preserving the independence of lawyers through the avoidance of unwarranted intrusion into their private files and mental processes.' Southern Ry. v. Lanham, 403 F.2d 119, 126 (C.A.5, 1968). And "since the litigants before the Labor Board are legion, the evil of harassment * * * is correspondingly multiplied. The function of deciding controversies might soon be overwhelmed by the duty of answering questions about them." Davis v. Braswell Motor Freight Lines, Inc., 363 F.2d 600, 604 (C.A.5, 1966).
 
 
 34
 Of course, the fact that an agency document was written by a lawyer does not necessarily make it 'work product.' The executive branch of our government employs and uncountable and ever-growing number of attorneys, and the Act can hardly be understood as protecting everything they put on paper. In the federal courts the privilege may be invoked only for materials 'prepared in anticipation of litigation or for trial.' Fed.R.Civ.P. 26(b)(3). This is a phrase that must be interpreted with caution, and the case law affords relatively little guidance.[26] To say that the investigation reports in this case were prepared in anticipation of litigation is not without difficulties, because they were written at the very outset of the Regional Office's involvement in the case, before there had been any authoritative determination that the charges had substance. But there are weighty considerations on the other side. Where unfair labor practices are concerned, the Regional Office's basic function is to litigate. Moreover, Davis and Howard could not have known when they wrote their reports which cases Phillips would want dismissed. Their written evaluations of the evidence necessarily were founded on the assumption that any given charge might become enmeshed in litigation. Insofar as the privilege is meant to promote candid expressions of an attorney's theories and perspectives, it cannot properly be made to turn on whether litigation actually ensued.[27] Since 'the prospect of litigation (was) identifiable because of specific claims that (had) already arisen,' Stix Prods., Inc. v. United Merchants & Mfrs., Inc., 47 F.R.D. 334 (S.D.N.Y.1969), the reports are subject to a prima facie valid claim of privilege. These documents are quite different from the memoranda which were held disclosable (and thus, by implication, not work products) in Sears, because the latter were not composed until after an authoritative decision to dismiss had been reached.
 
 
 35
 In an ordinary civil suit we would next go on to consider whether the claim was outweighed by the opposing litigant's evidentiary needs,[28] but in an FOIA suit the plaintiff's needs cannot be considered, since all members of the public have equal rights under the Act.[29] Instead the question is whether any reasonably segregable portion of the documents remains after the parts protected by work-product policies are determined. In our view, even the factual matters in these reports (which might not be protected by executive privilege) are protected by the work-product privilege. Writing in contemplation of forthcoming unfair labor practice litigation, an attorney must be able not only to discuss doctrinal theories but also to 'assemble information, (and) sift what he considers to be the relevant from the irrelevatn facts' without feeling that he is working for his adversary at the same time. Hickman v. Taylor, 329 U.S. at 511, 67 S.Ct. at 393, 91 L.Ed. at 462. The feeling would be well justified if we allowed the FOIA to be used to force disclosure of such materials.
 
 
 36
 This case is a particularly strong one for recognizing the privilege. The contents of the reports are not primary information, such as verbatim witness testimony or objective data, but rather are mainly reports on how the Birmingham attorneys appraised the evidence they found. Thus the reports consist largely of 'mental impressions, conclusions, opinions, (and) legal theories' within the meaning of the Federal Rule. Such materials, if prepared in anticipation of litigation or for trial, are always protected by a properly-raised claim of work product privilege, regardless of the opposing litigant's need.
 
 
 37
 We do not hold that the 'Final Investigation Reports' of NLRB Regional Offices are always wholly within the attorney work-product privilege. In a closer case the District Court might be obliged to consider, possibly through in camera proceedings or the taking of extrinsic evidence,[30] whether any portions of the records could be disclosed without offending work-product rule policies.[31] But our examination of these documents convinces us that they are protected in their entirety by Exemption 5. Thus we have no occasion to pass on the government's alternative contention that the reports are within Exemption 7.
 
 
 38
 Reversed.
 
 
 
 [1]
 The Act was amended by Pub.L. 93--502, 88 Stat. 1564 (1974). Except where otherwise indicated, all citations to the FOIA in this opinion are to the amended statute
 
 
 [2]
 5 U.S.C. § 552(a)(2):
 'Each agency, in accordance with published rules, shall make available for public inspection and copying--
 (A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;
 (B) those statements of policy and interpretations which had been adopted by the agency and are not published in the Federal Register; and
 (C) administrative staff manuals and instructions to staff that affect a member of the public;
 unless the materials are promptly published and copies offered for sale. . . . Each agency shall also maintain and make available for public inspection and copying current indexes providing identifying information for the public as to any matter . . . required by this (subsection) to be made available or published.'
 
 
 [3]
 5 U.S.C. § 552(a)(3):
 'Except with respect to the records made available under paragraphs (1) and (2) of this subsection, each agency, upon any request for records which (A) reasonably describes such records and (B) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.'
 
 
 [4]
 5 U.S.C. § 552(b):
 'This (Act) does not apply to matters that are . . . (5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency; . . .'
 '(7) investigatory records compiled for law enforcement purposes, but only to the extent that production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel . . ..'
 
 
 [5]
 See note 15 infra
 
 
 [6]
 This document is no longer in existence
 
 
 [7]
 The remaining charges were withdrawn by the charging party a few days later, at Howard's suggestion
 
 
 [8]
 Kent requested the following records:
 '1. The final opinion or order of the Regional Director or his authorized deputy or assistant, directing or authorizing the issuance of a complaint or complaints in Case Nos. 10--CA--10091, 10099, 10179 and 10272. See (D.C.) 346 F.Supp. (751) at 754 should there by (sic) any doubt as to the meaning of this item.
 '2. The Regional Director's instructions to his staff to issue said complaint or complaints.
 '3. The order or instructions to staff, of the Regional Director, or his authorized deputy or assistant, to suspend, delay or hold up on deciding the objections filed by the employer in Case No. 10--RC--9556.
 '4. All advice or appeals memoranda or similar opinions, decisions or orders issued by the General Counsel of the NLRB in any of the above referenced cases, if there be any.
 '5. The final opinion or order of the Regional Director, or his authorized deputy or assistant, in Case Nos. (sic) 10--CA--10077, recommending to the charging party that it withdraw the charge in that case, and making the determination to dismiss the charge if not withdrawn; namely, the document referred to in Section 101.5 of the Board's Statement of Procedure with respect to that case.
 '6. Any documents incorporated by reference in any of the above documents.
 '7. The index to advice and appeals memoranda in closed cases required to be kept by 5 USCA § 552(a)(2), and which was prepared during the pendency of the Sears, Roebuck case.'
 
 
 [9]
 See Continental Oil Co. v. FPC, 519 F.2d 31 (C.A.5, 1975), petition for cert. filed sub nom. Superior Oil Co. v. FPC, 44 U.S.L.W. 3445 (U.S., Feb. 2, 1976) (No. 75--1094); Stokes v. Brennan, 476 F.2d 699 (C.A.5, 1973); Wu v. National Endowment for Humanities, 460 F.2d 1030 (C.A.5, 1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1352, 35 L.Ed.2d 586 (1973); Evans v. Department of Transportation, 446 F.2d 821 (C.A.5, 1971), cert. denied, 405 U.S. 918, 92 S.Ct. 944, 30 L.Ed.2d 788 (1972); NLRB v. Clement Bros. Co., 407 F.2d 1027 (C.A.5, 1969) (dictum). Documents like those involved in the present case were at issue in Seafarers Int'l Union AFL--CIO v. Baldovin, 508 F.2d 125 (C.A.5, 1975), but the controversy became moot before we had a chance to consider the merits. 511 F.2d 1161 (C.A.5, 1975)
 Naturally the Board is not unfamiliar with the FOIA, either. For a collection of the case law, see Samoff & Falkin, The Freedom of Information Act and the NLRB, 15 B.C.Ind. & Com.L.Rev. 1267 (1974).
 
 
 [10]
 Before the 1974 amendments, corresponding language provided that a request for any 'identifiable records' was sufficient. 5 U.S.C. § 552(a)(3) (1970)
 
 
 [11]
 5 U.S.C. § 552(b)(5)
 
 
 [12]
 5 U.S.C. § 552(b)(7)
 
 
 [13]
 Similarly, we have said that the exemption 'is designed to encourage the free exchange of ideas among government policymakers.' Stokes v. Brennan, supra, 476 F.2d at 703
 
 
 [14]
 See Bayview Associates v. NLRB, 88 L.R.R.M. 2331 (D.D.C., 1974) (by implication); Automobile Club v. NLRB, 84 L.R.R.M. 2423 (D.D.C., 1973), aff'd mem., 162 U.S.App.D.C. 18, 495 F.2d 1074 (1974) (by implication)
 
 
 [15]
 See Stokes v. Brennan, 476 F.2d 669 (C.A.5, 1973); Davis, The Information Act: A Preliminary Analysis, 34 U.Chi.L.Rev. 761, 770--72 (1967)
 There is language in Renegotiation Board v. Grumman Air-Craft Engineering Corp., 421 U.S. 168, 186--87, 95 S.Ct. 1491, 1501, 44 L.Ed.2d 57, 72 (1975), which could be read to suggest that an agency decision is not 'final' unless the decision is owed some kind of deference by whatever authority reviews its conclusions, as opposed to being subject to de novo review. The Court's example of such deference was the 'clearly erroneous' and 'abuse of discretion' standards by which Courts of Appeals review certain District Court conclusions. The record before us does not indicate that a Regional Director's dismissal of a complaint carries any formal weight with the Appeals Branch. Yet we do not read Grumman as saying that the acid test of finality is whether a decision carries legal weight on appeal. There are many District Court conclusions which Courts of Appeals are bound to reconsider de novo. Moreover, we cannot close our eyes to the fact that as a practical matter the General Counsel's Office does tend to accept the judgments of Regional Directors. The General Counsel told a House subcommittee in 1961:
 'The Committee should bear in mind in this connection that the percentage of reversals (on the average about 6%) will necessarily be small since all of the cases on appeal have been subjected to careful evaluation at the Regional Office level by top-echelon field personnel, the great majority of whom have had long years of experience and proven integrity and ability, (which) provides a firm guarantee that the decision in every appeals case is made on the basis of a careful de novo evaluation and review (below) of the evidence disclosed by the field examination.'
 CCH Lab.L.Rep. P1150.05 at 3083. The Supreme Court in Grumman left open the possibility that 'de facto decisional authority' could bear on the question of whether a final disposition is present. 421 U.S. at 185 n. 22, 95 S.Ct. at 1500, 44 L.Ed.2d at 71 n. 22. It is hard to deny that agencies which are sustained well over ninety percent of the time are actively participating in the creation of Board law.
 
 
 [16]
 Plaintiff raises no contentions concerning subsection (a)(2)(B), which directs the releasing and indexing of 'statements of policy and interpretation which have been adopted by the agency,' and thus we are not required to construe it. But, in view of the considerations we have just advanced, we would have serious reservations about any assertion that the Regional Office 'adopted' these marked-up reports as policy. Cf. Sterling Drug, Inc. v. FTC, 146 U.S.App.D.C. 237, 450 F.2d 698 (1971)
 
 
 [17]
 See note 21 infra
 
 
 [18]
 'It was not the function of the court to probe the mental processes of the Secretary in reaching his conclusions if he gave the hearing which the law required.' Morgan v. U.S., 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129, 1132 (1938). See also U.S. v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429, 1435 (1941); Bank of Commerce of Laredo v. City National Bank of Laredo, 484 F.2d 284, 287 (C.A.5, 1973), cert. denied, 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974); NLRB v. Sun Drug Co., 359 F.2d 408, 413 (C.A.3, 1966); K. Davis, Administrative Law Treatise § 11.05 (1958). On the relevance of the Morgan rule to Exemption 5, see generally Montrose Chem. Corp. v. Train, 160 U.S.App.D.C. 270, 491 F.2d 63 (1974)
 
 
 [19]
 See J. H. Rutter Rex, Mfg. Co. v. NLRB, 473 F.2d 223, 231 (C.A.5), cert. denied, 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973); Davis v. Braswell Motor Freight Lines, Inc., 363 F.2d 600, 604 (C.A.5, 1966)
 
 
 [20]
 We do not suggest that the documents are within Exemption 5 because of Kent's motives; 'any person' has the same rights under the Act as any other person. § 552(a)(3); EPA v. Mink, 410 U.S. 73, 92, 93 S.Ct. 827, 838, 35 L.Ed.2d 119, 135; Sears, 421 U.S. at 143 n. 10, 95 S.Ct. at 1513, 44 L.Ed.2d at 43 n. 10. Rather we take advantage of the instant circumstances to point out the general problem with which the FOIA is concerned
 
 
 [21]
 Pederson, Formal Records and Informal Rulemaking, 85 Yale L.J. 38, 84 (1975)
 There are circumstances in which the Morgan ban on probing mental processes of agencies does not apply: most notably, where a 'strong (preliminary) showing of bad faith or improper behavior' has been made. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136, 156 (1971); see also KFC National Management Corp. v. NLRB, 497 F.2d 298 (C.A.2, 1974); Singer Sewing Machine Co. v. NLRB, 329 F.2d 200 (C.A.4, 1964); S. D. Warren Co. v. NLRB, 342 F.2d 814, 816--17 (C.A.1, 1965), cert. denied, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 300 (1966). But, as Pederson continues, '(t)he bad faith or improper conduct exception to the protection afforded by Morgan in judicial review has not yet been read into the . . . exemption.' 85 Yale L.J. at 84. In this case we need not decide the somewhat different question of whether a substantial showing of agency bad faith, of a kind that normally would make pre-decisional documents 'available by law to a party other than an agency in (civil) litigation with the agency,' § 552(b)(5), will also make those documents available to 'any person' through the FOIA. For here Kent's charges of impropriety were simply too flimsy to meet the Overton Park standard. NLRB v. Kent Corp., slip opin. p. 2764, 530 F.2d 610 (C.A.5, 1976).
 
 
 [22]
 This does not mean that the result would differ if no letter had been written. Indeed, in Case Nos. 10--CA--10077 and --10091 the Board successfully solicited the charging party to withdraw certain charges, and thus no document was released explaining these decisions not to issue a complaint. We mention the letter only because it clarifies the role of the Final Investigation Report in the particular instance involved
 
 
 [23]
 Kent's complaint, which made a specific demand for staff instructions (see note 8, supra), can fairly be read as putting subsection (a)(2)(C) into issue. We note, however, that we can consider this provision only as it relates to the materials the District Court ordered disclosed. Kent did not cross-appeal from the District Court's failure to order release of the other documents
 
 
 [24]
 See note 30 infra
 
 
 [25]
 On the scope of the informer's privilege in civil litigation, see our recent discussion in Hodgson v. Charles Martin Inspectors of Petroleum, Inc., 459 F.2d 303 (C.A.5, 1972)
 
 
 [26]
 See, e.g., Burlington Industries v. Exxon Corp., 65 F.R.D. 26, 42--43 (D.Md.1974); Garfinkle v. Arcata Nat'l Corp., 64 F.R.D. 688 (S.D.N.Y.1974); Stix Prods., Inc. v. United Merchants & Mfrs., Inc., 47 F.R.D. 334 (S.D.N.Y.1969). See also 8 Wright & Miller, Federal Practice & Procedure § 2024 (1970)
 
 
 [27]
 Cf. Duplan Corp. v. Moulinage et Retorderie de Chavanoz, 509 F.2d 730 (C.A.4, 1974) (en banc), cert. denied, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975) (privilege does not necessarily terminate at close of litigation for which materials were prepared)
 
 
 [28]
 See Fed.R.Civ.P. 26(b)(3); J. H. Rutter Rex Mfg. Co. v. NLRB, supra, 473 F.2d at 234--35
 
 
 [29]
 See note 20, supra
 
 
 [30]
 In order to make consideration of FOIA claims both thorough and efficient, courts should be prepared to employ a judicious blend of affidavit evidence, oral testimony, and in camera inspection. EPA v. Mink, 410 U.S. 73, 92--94, 93 S.Ct. 827, 838, 35 L.Ed.2d 119, 135--36 (1973); see generally Comment, In Camera Inspections Under the Freedom of Information Act, 41 U.Chi.L.Rev. 557 (1974). With regard to situations in which a defendant agency contends that a massive set of requested records contains no reasonably segregable, nonexempt portions, the District of Columbia Circuit has held that a District Court has discretion to require the agency to prove its claim by a detailed, section-by-section analysis of the material. Vaughn v. Rosen, 157 U.S.App.D.C. 340, 484 F.2d 820 (1973). cert. denied, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974)
 
 
 [31]
 Cf. Southern Ry. v. Lanham, supra, 403 F.2d at 133