Scott ARMSTRONG, et al., Plaintiffs,

v.

George H.W. BUSH, et al., Defendants.

Civ. A. No. 89–142.

United States District Court,
District of Columbia.

Sept. 15, 1989.

Katherine A. Meyer, Patti A. Goldman, Alan B. Morrison, Public Citizen Litigation Group, Washington, D.C., Kate Martin, American Civil Liberties Union, Washington, D.C., for plaintiffs.

David J. Anderson, Elizabeth A. Pugh, Mona S. Butler, Jeffrey G. Knowles, with whom Stuart E. Schiffer was on the briefs, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Jay B. Stephens, U.S. Atty. for the District of Columbia, on the briefs, for defendants.

CHARLES R. RICHEY, District Judge.

Broadly put, the issue before the Court is whether a private plaintiff may seek the assistance of a federal court to ensure that the President of the United States complies with any of several recordkeeping statutes pertaining to presidential records. Put more narrowly, the issue—one of first impression—is whether the plaintiffs here may challenge, under the Presidential Records Act, 44 U.S.C. § 2201 *et seq.*, and other similar recordkeeping statutes, a decision by the President to delete forever the entire contents of an electronic message system maintained by various entities within the Executive Office of the President. Further, if the plaintiffs may maintain such an action as a matter of constitutional law, do these electronic messages qualify for retention under the recordkeeping statutes themselves?

As described herein, resolution of these questions demands that the Court navigate the muddy waters of separation-of-powers jurisprudence, as well as the equally muddy waters of electronic communications technology. Having done so, the Court concludes that the plaintiffs may maintain such an action. Further, the Court concludes that at least some of the electronic messages at issue may qualify for retention under the pertinent recordkeeping states. The government's motion to dismiss the complaint, or in the alternative for summary judgment, will be denied.

I.

A. *The PROFS Communications System*

Various entities within the Executive Office of the President (the "EOP") provide

computers for their employees. These computers, in turn, utilize the Professional Office System ("PROFS"), an inter-computer communications system marketed by the IBM Corporation. PROFS permits the user of one computer to send any of three types of communications to any other (or all) computers linked to the central EOP network: (1) short "notes," or "mail"; (2) larger documents, which the recipient can revise; and (3) individual calendars.[1] Any PROFS communication, regardless of its size, can be printed out in hard copy. However, any PROFS communication can also be deleted immediately by the sender and/or the recipient without printing. If a message is so deleted from the system, it is possible that no record would exist of its ever having been created.

The EOP employs limited "backup" procedures regarding PROFS communications. For instance, the National Security Council (the "NSC"), an entity within the EOP, creates weekly backup tapes of all PROFS messages that have not been deleted from the system. Each Saturday night, the NSC takes what amounts to a "snapshot" of all messages on the system by preparing a backup tape. This backup tape captures only those messages on the system at the time the tape is prepared; it cannot retrieve messages that may have been prepared during the week but that were either intentionally or inadvertently deleted by the sender or recipients. The NSC keeps backup tapes for two weeks. After two weeks, the backup tapes are recycled and their contents permanently flushed. The remainder of the entities within the EOP commence the above-described backup cycle nightly, and keep the tapes for four to six weeks before disposal of the messages.

## B. *The Statutory Framework*

Several federal statutes combine to ensure the permanent retention and public disclosure of a broad variety of federal "records." The most prominent is the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The FOIA directs each "agency" of the federal government to make publicly available, upon request, all "agency records" that do not fall within certain statutory exemptions. 5 U.S.C. § 552(a)(3). FOIA, however, is a disclosure statute, and a disclosure statute only; it imposes no obligations and provides no guidance for the creation or disposal of particular records. *See, e.g., Kissinger v. Reporters Committee for the Freedom of the Press,* 445 U.S. 136, 152, 100 S.Ct. 960, 969, 63 L.Ed.2d 267 (1980) ("the agency is not required to create or to retain records under the FOIA").

On the other hand, the amalgam of statutes codified at Title 44 of the United States Code does govern the creation and disposal of federal records. These statutes (collectively referred to herein as the "Records Laws"), obligate the various components of the federal government to create, retain and, when appropriate, dispose of all "records" within their control.

Two such statutes are of primary importance here: (1) the Federal Records Act of 1950, as amended, 44 U.S.C. § 2901, *et seq.* (the "FRA"),[2] and (2) the Presidential Records Act of 1978, 44 U.S.C. § 2201, *et*

---

**1.** The PROFS system achieved (and may continue to achieve) some notoriety in connection with the investigation and prosecution of the participants in the so-called "Iran–Contra" affair (some have referred to it as "Iranamok"). It appears that certain participants sent PROFS messages containing the details of the scheme by which arms would be sold to Iran, with the proceeds diverted to the use of the Nicaraguan Contras. The exegesis of mysterious PROFS notes consumed much time during the congressional investigation of the matter, as well as during the recently concluded criminal trial of Lt. Colonel Oliver North.

**2.** There are actually two chapters within Title 44 that pertain to the maintenance of records by the entire federal government: (1) the Records Management by the Archivist of the United States and by the Administrator of General Services Act, 44 U.S.C. § 2901, *et seq.,* and (2) the Records Management by Federal Agencies Act, 44 U.S.C. § 3101, *et seq.* The two substantially overlap, however, and for ease of discussion

*seq* (the "PRA").[3] The FRA provides that the head of each federal agency "shall make and prepare records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency...." 44 U.S.C. at § 3101. It vests in the Archivist of the United States the general responsibility of "guiding and assisting" federal agencies in their compliance with the statute, as well as the responsibility of "promulgat[ing] standards, procedures, and guidelines with respect to records management." *Id.* at § 2904. The Archivist may inspect an agency's records to ensure proper management. *Id.* at § 2906(a)(1).[4]

The PRA is directed to the President himself, and provides that he "shall take all such steps as may be necessary" to assure that "Presidential records" are maintained in compliance with the statute. 44 U.S.C. § 2203(a). The statute vests "complete ownership, possession, and control of Presidential records" in the United States. *Id.* at 2202. The statute defines "Presidential records" to include "documentary materials ... created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President ... which relate to or have an effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. at § 2201(1).

Like the FRA, the PRA calls upon the Archivist to assist the President in performing his statutory duties. Should a President decide during his term to dispose of Presidential records that "no longer have administrative, historical, informational, or evidentiary value", he must request the Archivist's views as to the wisdom of the disposal. *Id.* at § 2203(c). The Archivist may notify Congress of the disposal if he deems it appropriate. *Id.* at § 2203(e).[5] After a President leaves office, the Archivist "shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." *Id.* at § 2203(f)(1). After notice in the Federal Register, the Archivist may then dispose of such Presidential records as he feels appropriate in light of their value. *Id.* at § 2203(f)(3). Once he has left office, the President may instruct the Archivist to prohibit public access to certain categories of Presidential records for as long as 12 years. *Id.* at § 2204.[6] Once a Presidential record is in the Archivist's hands, and once any period of prohibited access specified by the (then ex-) President has passed, the Presidential record becomes subject to disclosure under the FOIA, albeit with some restrictions. *Id.* at § 2204(c).

Neither the FRA nor the PRA expressly confers a private right of action to enforce compliance; indeed, neither statute anywhere expressly contemplates judicial enforcement of its terms.

The *White House Office Staff Manual* (1988) attempts generally to guide EOP staff members as to their duties under the PRA. It provides a synopsis of the Act's requirements, and specifies broad categories of documents which may or may not qualify as Presidential records. The record indicates that the *Manual* is the only consistent, EOP-wide guideline for compliance with the PRA. However, as a supplement to the *Manual*, and in anticipation of the transition from the Reagan administration to the Bush administration, the Counsel to the President (Arthur B. Culvahouse) dis-

---

will be referred to jointly as the Federal Records Act.

**3.** It appears that this is the first case in which a court has been called upon to consider the President's duties under the PRA.

**4.** The disposal of "agency records" created and maintained under the Federal Records Act is governed by the Disposal of Records Act, 44 U.S.C. § 3301, *et seq.*

**5.** Even if the Archivist informs Congress of the President's planned document disposal, the President may proceed with the disposal if he provides the "appropriate" congressional committees with the disposal schedule "at least 60 calendar days of continuous session of Congress in advance of the proposed disposal date." *Id.* at § 2203(d).

**6.** Vice–Presidential records are treated in the same manner as Presidential records. *Id.* at § 2207.

tributed a memorandum dated December 1, 1988, reminding EOP staff of their PRA obligations, and providing additional detail as to how they might comply. The *Manual* makes no reference to information on the PROFS system; the Culvahouse memorandum, however, reminded staff members to review their computer files to ensure that no Presidential records were inadvertently deleted.[7]

With regard to those components of the EOP that create Federal records under the FRA (as opposed to Presidential records under the PRA), the *Files Maintenance Manual* offers guidance. Although it is somewhat more detailed than the White House *Manual*, it too makes no explicit reference to PROFS, or to the possibility that information contained in the PROFS system might qualify as Federal records. Different memoranda sent to staff members of the NSC, however, were intended to alert them to the possibility that the PROFS system might contain Federal records or Presidential records.[8]

### C. *This Action*

On the eve of the transition from the Reagan administration to the Bush administration, Reagan administration officials began preparing to dispose of the contents of the PROFS system. The plaintiffs learned of the scheduled disposal, and, on January 19, 1989, submitted a FOIA request to the EOP, the NSC and the Archivist for:

> copies of all tapes, discs, and/or other storage formats for the PROFS System serving the Executive Office of the President and/or National Security Council, and all information contained therein, as well as all records in whatever format derived from the PROFS System, from the date of the installation of said system to the end of the Reagan Administration.

The plaintiffs filed this suit that afternoon. Their complaint principally seeks declaratory and injunctive relief under the FOIA, the PRA and the FRA. They allege that a substantial amount of information contained on the PROFS system qualifies as either agency records under the FOIA and the FRA, or Presidential records under the PRA. They ask the Court to enjoin disposal of the PROFS information, and to direct the President (as head of the EOP) and the NSC to properly classify the information under either the PRA or the FRA, and to thereafter subject it to the "life cycle" contemplated by both statutes. They also allege that the Archivist has "abdicated" his statutory responsibilities by "failing to exercise proper oversight" of the decisions of the President and the NSC with regard to the PROFS information. They thus ask that the Archivist be ordered "to carry out his duties under the laws and regulations he administers."

---

**7.** With respect to PROFS information, the Culvahouse memorandum provided as follows:

> While the vast bulk of your records should already appear in well-organized files, you should take care to review your word-processing and/or PROFS computer memory to ensure that you have made a hard copy of all "record" material appearing there which can be transferred to ORM. Users of the EOP Electronic Mail system should be aware that while many electronic mail messages may be the equivalent of telephone calls and not rise to the level of record materials, some of them may contain information concerning the President's constitutional, statutory and ceremonial duties that you are required, under the terms of the Presidential Records Act, to memorialize. Those messages that do contain that information should be converted into hard copy for transfer to ORM.

Butler Decl., Exh. 2 (Culvahouse Memorandum at 3).

**8.** For instance, a December 20, 1988, memorandum to the staff of the NSC from Paul Schott Stevens provides as follows:

> I anticipate that there are no federal or presidential records maintained in your computer files that are not also to be found in our formal records systems. Incident to the change of Administration, such computer files may no longer be accessible after January 20, 1989. Therefore, in order to guard against the inadvertent loss of any record, however, I ask that you review your computer files prior to your departure or January 20, 1989, whichever comes first. Should you identify therein any federal or presidential record ... that you believe may not be contained in the Secretariat systems, please forward it in hard copy to George Van Eron for appropriate action.

Van Eron Decl., Exh. 5.

On the afternoon of January 19, Judge Parker of this Court temporarily enjoined the defendants from disposing of "what is commonly known as the PROFS computer tapes for the National Security Council and the Executive Office of the President or in any way deleting or destroying the information contained in the back-up files of the PROFS Computer System." [9] The defendants have now moved to dismiss, or, in the alternative, for summary judgment. The motion is ripe for decision.

## II.

The defendants' motion essentially rests upon two arguments: (1) that separation of powers principles preclude an action to force the President's compliance with either the PRA or the FRA; and (2) that, even if such an action can be brought, the President's actions manifest complete compliance with both statutes. Regarding the latter contention, the defendants argue that the PROFS information does not constitute agency records or Presidential records as a matter of law. Further, even if it does, they argue that the President's treatment of the information is either unreviewable because it has been "committed to the [President's] discretion by law" under the Administrative Procedures Act (the "APA"), 5 U.S.C. § 701(a)(2), or is permissible under the APA's "arbitrary and capricious" standard, 5 U.S.C. § 706(2).

The Court concludes that the plaintiffs may bring an action to force the President's compliance with the PRA and the FRA. Although neither the PRA nor the FRA itself gives rise to this cause of action, the Court holds that the APA empowers a private plaintiff to seek judicial review of presidential performance under these statutes. Further, the Court concludes that presidential action under the PRA is not "committed to agency discretion" under § 701(a)(2) of the APA. Moreover, it is not apparent as a matter of law that the challenged PROFS information does not constitute agency records or Pres-

idential records. As for the substance of the Court's review under the APA, the Court concludes that disputed issues of material fact preclude a present determination as to whether the President's performance of his statutory obligations has been "arbitrary or capricious," or "otherwise not in accordance with law" under § 706(2).

### A. Judicial Review of the President's Compliance with the PRA and the FRA

The defendants contend that the plaintiffs may not maintain this suit because neither the PRA nor the FRA provide a private cause of action, and that to imply such an action would violate the doctrine of separation of powers. The Court agrees that neither statute provides for judicial review of presidential action, but concludes that such review is permissible under the APA. Further, standards exist by which the President's performance under the PRA and the FRA may be measured.

#### 1. Private Right of Action

In *Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980), the Supreme Court held that the FRA does not permit private plaintiffs to bring suit in an effort to enforce its terms. In that case, the Court assumed *arguendo* that Henry Kissinger had violated the FRA by removing certain tape recordings of conversations in which he had participated while at the Department of State and the NSC. The Court, however, found that the *Kissinger* plaintiffs—a group of journalists and historians—had no right to enforce Kissinger's compliance with the FRA. The Court held that the FRA creates no right of action for private plaintiffs; Justice (now Chief Justice) Rehnquist explained that the FRA and the other records acts were intended "not to benefit private parties, but solely to benefit the agencies themselves and the Federal Government as a whole." *Id.* at 149, 100 S.Ct. at 968. Accordingly, "regardless of whether Kissinger has vio-

9. *Armstrong v. Bush,* No. 89–0142 (D.D.C. January 19, 1989) (temporary restraining order). After issuance of the temporary restraining order, the defendants agreed to maintain the PROFS information until final resolution of this action.

lated [the federal records laws], Congress has not vested federal courts with jurisdiction to adjudicate that question upon suit by a private party. That responsibility is vested in the administrative authorities." *Id.* at 149–50, 100 S.Ct. at 968. In so holding, the Court expressly reserved judgment as to whether review might be sought under the APA. *Id.* at 150 n. 5, 100 S.Ct. at 968 n. 5.[10]

■ *Kissinger* controls here: directly as to the FRA, and by analogy as to the PRA. For purposes of the private right of action inquiry, the PRA is largely indistinguishable from the FRA; accordingly, in the Court's view, no private action may be maintained directly under either statute in federal court. As with the FRA, the PRA merely "proscribes certain conduct," and "does not 'create or alter any civil liabilities.'" *Kissinger*, 445 U.S. at 148, 100 S.Ct. at 967 (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979)). Further, the PRA's remedial scheme appears to contemplate administrative action, and congressional oversight, as the primary enforcement mechanisms, at least in the first instance. The statute's operations neither create nor infringe directly upon private interests. The Court thus concludes that private plaintiffs may not create federal court jurisdiction through direct reliance upon the PRA.[11]

## 2. Judicial Review under the APA

■ This holding does not dispose of the plaintiffs' claims under the APA. While no direct private right of action may exist under the PRA or the FRA, "[a] separate indication of congressional intent to make agency action reviewable under the APA is not necessary; instead, the rule is that the cause of action for review of such action is available absent some clear and convincing evidence of legislative intention to preclude review." *Japan Whaling Assoc. v. American Cetacean Soc.*, 478 U.S. 221, 230 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986). The defendants contend that Congress intended to preclude judicial review of presidential action under the PRA and FRA, arguing that such review would violate the doctrine of separation of powers. Further, setting separation of powers concerns aside, they argue that the actions at issue here are unreviewable under § 701(a)(2) of the APA because the President's performance under the PRA is "committed to agency discretion," and that there is "no law to apply." The Court rejects both arguments.

The defendants' separation of powers argument contains two strands. The first relies upon the legislative history of the PRA, and the Supreme Court's construction of an analogous presidential recordkeeping statute in *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). The second strand is more fundamental; with it the

---

**10.** In footnote 5, the Court stated that "[w]e need not decide what remedies might be available to private plaintiffs complaining that the administrators and the Attorney General have breached a duty to enforce the Records Act, since no such action was brought here." *Id.*

**11.** Neither does the FOIA confer jurisdiction to award the relief the plaintiffs seek. By the defendants' own admission, they seek an order directing the President to designate information on the PROFS system as either Presidential records under the PRA or agency records under the FRA. They do not seek immediate disclosure. Yet, it is axiomatic that FOIA does not permit a court to direct an agency to create or retain records. As the Supreme Court stated in *Kissinger*:

The [FOIA] does not obligate agencies to create or retain documents; it only obligates

them to provide access to those which it in fact has created and retained. It has been settled by decision of this Court that only the Federal Records Act, and not the FOIA, requires an agency to actually create records, even though the agency's failure to do so deprives the public of information which might have otherwise been available to it. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161–62 [95 S.Ct. 1504, 1521–22, 44 L.Ed.2d 29] (1975): *Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 192 [95 S.Ct. 1491, 1504, 44 L.Ed.2d 57] (1975).

445 U.S. at 152, 100 S.Ct. at 969. Accordingly, because this action is at bottom one to compel the "creation" of statutory "records," the plaintiffs err insofar as they seek to base jurisdiction upon the FOIA.

defendants assert that basic concepts of judicial review, as articulated in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), preclude judicial intervention into the President's performance of his duties under these statutes. The Court will address each contention in turn.

### a. *The Nixon Case and the PRA*

In *Nixon*, 433 U.S. at 441–46, 97 S.Ct. at 2789–91, the Supreme Court considered ex-President Nixon's constitutional challenge to the Presidential Recordings and Materials Preservation Act. That statute directed the Administrator of the General Services Administration to take possession of various of Nixon's presidential papers and tape recordings, and to promulgate regulations establishing procedures for ultimate public access to these materials. Nixon argued that the assertion by Congress of control over presidential effects violated the separation of powers doctrine. The Court rejected Nixon's arguments as unduly formalistic; Nixon's views, according to the Court, evidenced an "archaic" view of the separation of powers principle. 433 U.S. at 443, 97 S.Ct. at 2790 (quoting three-judge district court). Although the analysis has been revisited several times since *Nixon*, the Court held that "the proper inquiry focuses on the extent to which [the statute] prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Id.* The Court continued: "Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Id.*

In concluding that the statute posed no threat of disrupting the President's performance of his constitutional duties, the Court found it "highly relevant" that, prior to public release, only members of the Executive Branch could exercise control over Nixon's effects. Because Executive control would precede public release, and thus permit the *effective* assertion of any claims of constitutional privilege, Congress' assertion of ultimate control was found not to involve a disruption of the President's performance of his functions. A close reading of *Nixon* makes clear that the Court's concern was for the protection of any claims of presidential privilege; were Congress to place control over presidential effects outside of the Executive Branch, or require public exposure before a President might effectively assert any claims of privilege, then certainly disruption of the President's performance would result. Without question, the expectation of permanent confidentiality is central to the President's performance of his duties; were that expectation compromised, perhaps by premature disclosure of privileged information, the process of presidential decisionmaking would suffer.

Congress was acutely aware of the Court's reasoning in *Nixon* when it drafted the PRA. Indeed, the House report accompanying the PRA specifically noted that "[w]ere Congress to give control of the papers to some entity outside the executive branch, the [Supreme Court] might well find such legislation unconstitutional." H.R.Rep. 1487 at 6. Congress therefore vested in the Archivist—a member of the Executive Branch—complete control over Presidential records prior to public disclosure.

The defendants point to Congress' concern with *Nixon*, and argue that judicial review of presidential decisions under the PRA would upset *Nixon*'s careful balance, and thus override the concerns which moved Congress to give the PRA its present structure. They argue that judicial review of the President's decision to dispose of information in the PROFS system would effectively transfer control over Presidential records to the judiciary, in violation of *Nixon*, the PRA's legislative intent, and the doctrine of separation of powers.

The Court disagrees. At the very most, judicial review would ensure *compliance* with the procedures and standards embodied in the statute; it would in no way alter them. "Control" over Presidential and agency records would lie always with the Archivist—i.e., always within the Executive Branch. Far from restricting that control, or requiring public disclosure any earlier

than or on different terms than are provided for in the statute, judicial review would help ensure the statute's integrity. The only power over the documents that might be sacrificed through judicial review of presidential decisions would be the power to violate the statute. Judicial elimination of that power can hardly be said to contravene the Constitution's separation of powers; rather, it appears to neatly integrate the judiciary's duty to "say what the law is," *see, e.g., United States v. Nixon,* 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974), with the Executive's duty to "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3.

### b. *Judicial Review of Presidential Actions—Marbury v. Madison*

Setting aside the foregoing, the defendants further contend that the President's decisions under the PRA are unreviewable because they constitute discretionary acts, and under *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), a federal court lacks the authority to review the discretionary acts of the Executive. The defendants further, and, in this Court's view properly, equate the discretionary/ministerial distinction with that between political and non-political questions. Because the President's decisions are discretionary under the statute, the defendants argue that a court may not review them because, being discretionary, they also constitute the wholly unreviewable exercise of the President's political authority.[12]

The Court has no quarrel with the defendants' statement of the law. Further, the Court agrees with the defendants that these analyses, whether separate or fundamentally unitary, are subsumed within § 701(a)(2) of the APA, which excludes from judicial review those decisions that "are committed to agency discretion by law." 5 U.S.C. § 701(a)(2). As Justice Scalia recently and persuasively explained in a dissent to the Court's opinion in *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988),[13] the "agency discretion" exception to judicial review under the APA was intended to encompass those decisions that, under the "common law" of judicial review, had previously been thought to be beyond the judiciary's power. According to Justice Scalia, the exception was intended to mirror and perpetuate:

> a body of jurisprudence that had marked out, with more or less precision, certain issues and certain areas that were beyond the range of judicial review. That jurisprudence included principles ranging from the "political question" doctrine, to sovereign immunity ..., to official immunity, to prudential limitations upon the courts' equitable powers, to what can be described no more precisely than a traditional respect for the functions of the other branches reflected in the statement in *Marbury v. Madison,* 1 Cranch 137, 170–71 [2 L.Ed. 60] (1803), that "[w]here the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is again repeated, that any application to a court to control, in any respect, his conduct, would be rejected without hesitation." [additional citations omitted].

*Id.* 108 S.Ct. at 2056. *See also Heckler v. Chaney,* 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985) (noting that APA's enactment not intended to alter tra-

---

**12.** Scholars have suggested that the discretionary/ministerial distinction, at bottom, is identical to the political question doctrine. *See, e.g.,* Winter, *The Metaphor of Standing and the Problem of Self–Governance,* 40 Stan.L.Rev. 1371, 1413 n. 225 (1988) ("The dictum in *Marbury,* referring to this limit on the reach of mandamus to compel discretionary public acts, formed the basis of the later political question doctrine."). Obviously, however, courts have developed different criteria to evaluate defenses based on each doctrine. *See, e.g., National Treasury Employees Union v. Nixon,* 492 F.2d 587, 602–06 (D.C.Cir.1974) (discussing the dis-

cretionary/ministerial analysis separately from the political question analysis).

**13.** The portion of Justice Scalia's *Webster* dissent that discussed § 701(a)(2) did not dispute the propriety of the majority's holding on the APA issue; it merely elaborated upon the majority's analysis, and explained certain areas of disagreement. Accordingly, it cannot be said that the Court is relying upon a view that, while accepted by Justice Scalia, has been rejected by a majority of the Court.

ditional conceptions of reviewability); K. Davis, *Administrative Law Treatise*, § 28:5–6 (noting that "committed to agency discretion" language intended to perpetuate traditional limitations upon the power of judicial review).

Accordingly, in the Court's view, the defendants' contention that both separation of powers principles, on the one hand, and the APA, on the other, preclude judicial review essentially argues two sides of the same coin: a decision under either analysis will decide the other, as § 701(a)(2) effectively imports into the APA the separation of powers principles articulated in *Marbury* and elsewhere.[14] The issue, then, is whether, under § 701(a)(2), the President's performance of his statutory duties in this case involves the exercise of discretionary political authority, and is thus beyond APA review. The Court finds that it is not.

The designation of Presidential records under the PRA is neither discretionary nor political.[15] The PRA provides that, "[t]hrough the implementation of records management controls and other necessary actions, the President *shall*" document the performance of his duties, and assure that such documents *"are* maintained as Presidential records...."" 44 U.S.C. § 2203(a) (emphasis added). The PRA's detailed definition of the term "Presidential record" denies the President any discretion in determining whether particular documents are, in fact, Presidential records. *See id.* at § 2201(2). Concededly, the designation

(or non-designation) of a Presidential record involves the application of law to fact, and, in this sense, can be said to involve some element of discretion: reasonable men might well differ over whether the PRA requires retention of a particular document. However, as the Supreme Court stated in *Roberts v. United States*, 176 U.S. 221, 231, 20 S.Ct. 376, 379–80, 44 L.Ed. 443 (1900):

> Every statute to some extent requires construction by the public officer whose duties may be defined therein. Such officer must read the law, and he must therefore, in a certain sense, construe it, in order to form a judgment from its language what duty he is directed by the statute to perform. But that does not necessarily and in all cases make the duty of the officer anything other than a purely ministerial one. If the law direct him to perform an act in regard to which *no discretion is committed to him,* and which, upon the facts existing, he is bound to perform, then that act is ministerial, although depending upon a statute which requires, in some degree, a construction of its language by the officer.

The Supreme Court's language in *Roberts* is directly pertinent to this case. The fact that the President must make a judgment as to whether a particular document is a Presidential record does not render the decision discretionary. The PRA sets forth clear standards by which the determination

14. This analysis also removes any concern that direct application of the APA to the President, as here, presents some grave threat to presidential prerogative or authority. Although no court appears directly to have applied the APA to the President, *but see Amalgamated Meat Cutters v. Connally,* 337 F.Supp. 737, 761 (D.D.C.1971) (dicta), most commentators have assumed that the President is an "agency" and thus subject to APA review. *See, e.g.,* K. Davis, *Administrative Law Treatise,* § 28:6 at 275 (2d ed. 1984) ("[t]he President is an 'agency' within the meaning of the APA"). Some, however, have expressed doubts as to whether, notwithstanding the APA's scope, courts actually should undertake APA-based review of presidential decisions. *See, e.g.,* Bruff, *Judicial Review and the President's Statutory Powers,* 68 Va.L.Rev. 1, 23 (1982) ("Application of the APA to the President might have some unfortunate consequences, because the APA and its judicial gloss do not take account of

the special character of the Presidency."). Yet, in the Court's view, an interpretation of § 701(a)(2) that, as here, incorporates the traditional bases upon which presidential actions are removed from judicial review, effectively removes the concern that APA review will somehow cramp the President's exercise of his constitutional functions.

15. As to the element of the NSC that produces "agency records" under the FRA, the Court of Appeals for this Circuit has already determined that *review of agency compliance with the FRA* and related statutes is available under the APA. *American Friends Service Comm. v. Webster,* 720 F.2d 29, 41–45 (D.C.Cir.1983). The issue for decision in this case is whether the President's compliance with the PRA—as opposed to an agency's compliance with the FRA—is subject to judicial review under the APA.

is to be made, and the President bears the clear, nondiscretionary duty to apply those standards properly. If the President errs, a court, having the power—indeed, the duty—to declare what the law is, must correct the mistake.

Concededly, § 2203(a) grants the President some latitude in determining how best to effect the retention of Presidential records. Nevertheless, while the means may be left to the President, the end is not; the obligation to actually retain Presidential records is clear and nondiscretionary. Under the PRA, the President simply may not, for political reasons incident to the performance of his duties, decide not to retain documents that otherwise qualify as Presidential records. Further, once he has determined that a particular document is a Presidential record, the President has no discretion to dispose of the document otherwise than in accordance with the procedures contained in the statute. *See id.* at § 2203. Thus, to the extent any information on the PROFS system qualifies as a Presidential record, and has not otherwise been reduced to hard copy, the President's unilateral decision to "flush" the PROFS system would appear to be an exercise of discretion that violates the PRA's disposal provisions.

The fact that Congress has so clearly chosen to divest the President of discretionary control over Presidential records, and instead to transfer such control to the United States, *see id.* at § 2202, goes a long way (if not all the way) toward answering the defendants' assertion that the "political question" doctrine precludes review under the PRA. Nevertheless, defendants argue that at least two of the "political question" criteria set forth in *Baker v. Carr,* 369 U.S. 186, 208, 82 S.Ct. 691, 705, 7 L.Ed.2d 663 (1962), are present here: (1) the impossibility of undertaking review under the PRA and APA without expressing a lack of respect for the President; and (2) the absence of "judicially discoverable and manageable standards" for conducting such review.

The Court disagrees. Review of the President's compliance with the PRA will in no way express a lack of respect for the Executive. Congress, not the Judiciary, has chosen to impose upon the President the recordkeeping burdens of the PRA. If disrespect is to be found anywhere, it lies with this initial decision by Congress.[16] Unless Congress did not mean what it said when it enacted the PRA, judicial enforcement of the President's obligations under the PRA hardly diminishes the respect due the Executive; if anything, it heightens respect for the Executive and the rule of law. Finally, the Court flatly rejects the claim that there exist no "judicially discoverable and manageable standards" against which the President's performance might be measured. The PRA is replete with standards, and they are of a type perfectly suited to judicial application.

The net of the foregoing leads to the conclusion that judicial review of the President's compliance with the PRA is permissible under the APA, and is not precluded by separation of powers concerns. The plaintiffs are entitled to invoke the APA in their efforts to ensure presidential compliance with the PRA.

### B. *PROFS Information as Presidential or Agency Records*

■ Whether the plaintiffs may maintain this action or not, the defendants contend that the complaint should be dismissed, or summary judgment granted in their favor, because the information at issue—the current contents of the PROFS system—does not involve Presidential or agency records that require retention.

The defendants' argument rests essentially upon the claim that the current contents of the PROFS system *must* be "non-record" material, because the applicable guidelines require the reduction to hard copy of all Presidential or agency records created or maintained in the PROFS system. Thus, the defendants continue, any information in the system must either fall outside the statutory definitions, or be duplicative of "record" information that has already been reduced to hard copy. Such

---

**16.** The defendants do not challenge the constitu-    tionality of the PRA itself.

information, both parties agree, need not be retained.

The defendants' argument, however, strikes the Court as manifestly conclusory; it is obviously contingent upon the degree to which users of the PROFS system actually *have* complied with the applicable guidelines. The Court therefore declines to grant the defendants' motion to dismiss on this basis. As for the defendants' motion for summary judgment on this ground, the record before the Court contains evidence sufficient to suggest that the users of the PROFS system historically have not at all times adhered to the applicable guidelines. This evidence, in the Court's view, is sufficient to create a genuine dispute as to a material fact; namely, the extent to which information currently being retained on the PROFS system qualifies as Presidential or agency records.

### C. *Adequacy of the Applicable Guidelines under the APA*

■ Finally, the defendants seek summary judgment on the ground that, under the APA, their efforts to comply with the PRA have been reasonable, and not "arbitrary and capricious" under § 706(2) of the APA. The defendants point to the various guidelines that have been provided to PROFS users, and assert that these satisfy their burden under the PRA and the APA.

The defendants' contentions may ultimately prove correct. At this juncture, however, the Court cannot find that a reasonable factfinder, surveying the record in the light most favorable to the plaintiffs, would necessarily conclude that the guidelines are adequate. Indeed, a reasonable factfinder might well conclude that the guidelines are inadequate in light of the history of the PROFS system's use.[17] Further, a reasonable person might quarrel with the rationality of the assumption upon which a substantial portion of the guidelines appears to be based: that most PROFS communications are analogous to

telephone messages, and thus need not be retained. It is true that telephone communications in and of themselves do not rise to the level of Presidential or agency records, unless they result in the creation of "documentary material." *See* 44 U.S.C. § 2201(1)(2) (defining "documentary material" in the PRA). This derives from the transitory nature of the *medium* by which the communication occurs; it does not suggest that the *substance* of a telephone communication is inherently insubstantial. Quite the contrary, were telephone conversations in the Executive Branch routinely taped, or otherwise reduced to "documentary material," a good portion would undoubtedly qualify as Presidential or agency records.[18] Here, the PROFS system, which purportedly serves as a "telephone surrogate," does make possible the retention of communications that might otherwise occur via telephone. Accordingly, a rational factfinder might find "arbitrary and capricious" the premise that merely because PROFS communications serve as an alternative to telephone calls or personal visits, they need not be retained. Further, because this premise appears to inform much of the guidelines' treatment of PROFS communications, a rational person might be likely to label the guidelines "arbitrary and capricious." The defendants' motion for summary judgment on this ground must be denied, pending further development of the record.

### III.

The defendants' motion to dismiss, or in the alternative for summary judgment, must be denied without prejudice to renewal after additional discovery. The plaintiffs have stated a claim under the APA, and may monitor the President's compliance with the PRA, as well as require those components of the EOP that produce agency records to comply with the FRA. Further, on this record at this time, there exist genuine issues of material fact that pre-

17. *See, e.g., supra* note 1.

18. *See Kissinger v. Reporters Committee for Freedom of the Press,* 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980) (detailed summaries or ver-

batim transcripts of telephone conversations involving Secretary of State Kissinger treated as agency records under the FOIA).

clude granting the defendants' motion for summary judgment on the questions of whether the PROFS backup tapes at issue qualify as Presidential or agency records, and whether the defendants' actions have been reasonable under the APA. At the conclusion of the discovery period described in the accompanying Order, the plaintiffs may or may not be as likely as the defendants to obtain judgment as a matter of law. The Court will issue an Order consistent with the foregoing.